AQUALANE SHORES, INC., A FLORIDA CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 55278. Filed May 29, 1958.

*W. A. Sheppard, Esq.,* and *William A. Sheppard, Jr., Esq.,* for the petitioner.

*Hugh G. Isley, Jr., Esq.,* for the respondent.

The respondent determined deficiencies in the petitioner's income taxes as follows:

| | |
|---|---|
| 1950 | $7,105.72 |
| 1951 | 9,999.62 |
| 1952 | 19,294.47 |

In view of certain concessions made by petitioner, the only question for our decision is whether the petitioner's basis in certain property is the same as it was to its transferors, i. e., $69,291.93.

### FINDINGS OF FACT.

Some of the facts in this case have been stipulated. The stipulation and the exhibits attached thereto are incorporated herein and made a part of our findings of fact by this reference.

Aqualane Shores, Inc., sometimes hereinafter referred to as the petitioner, is a corporation which was organized under the laws of the State of Florida. The petitioner filed its Federal corporation income

tax returns for the years 1950, 1951, and 1952 with the then collector and/or district director of internal revenue for the district of Florida. At all times involved herein the petitioner kept its books and reported its income on the accrual basis, utilizing the calendar year ending December 31.

Walker Construction Company is a partnership which was organized on January 1, 1948, and was engaged in the landscaping and grading business. Since its organization, Forrest Walker and his two sons, James L. Walker and Robert L. Walker, sometimes hereinafter referred to collectively as the Walkers, have been equal partners in Walker Construction Company, each owning a 33⅓ per cent interest. They have also carried on the same business under the name of Walker Developments. The names "Walker Developments" and "Walker Construction Company" are used interchangeably, each name referring to the same partnership composed of the three Walkers. On May 15, 1949, Forrest Walker, James L. Walker, and Robert Walker, described as copartners doing business as Walker Developments, purchased five contiguous parcels of undeveloped land in Naples, Florida, consisting of approximately 175½ acres, from Philip Rust and his wife at a cost of $69,850. A downpayment of 10 per cent was made and the balance due on the purchase price was secured by mortgage. The sale of this property was handled by Edwin M. Watson, a real estate broker who had held Rust's listing to sell for approximately 6 months prior to the sale to the Walkers. The parcels of land consisted largely of mangrove swamps and were bordered on the east by Naples Bay and on the south by land later created into a development known as Port Royal, which is described as "the ne plus ultra of Florida subdivisions." Waterfront property in Naples suitable for subdivision was difficult to obtain. It was the intention of the Walkers, at the time of the purchase from Rust, to render them suitable for subdivision into waterfront homesites. Practically all of this land had an elevation considerably less than the minimum of 6 feet required for residential use. Walker Construction Company had or later purchased draglines, a dredge, and other equipment needed to develop the land, which development included the clearing of land, dredging of canals, and the pumping of fill into the land abutting on the canals. This type of development by means of dredging canals would result in making practically all the land "waterfront property," even that part not adjacent to the Bay itself, and was at that time a novel type of development in south and west Florida although it had been accomplished on the east coast. It was the Walkers' original intention for the partnership to develop the property. This development was started by the partnership and included the digging of one canal and the filling of 2½ blocks of the subdivision, 27 lots, prior to January 10, 1950.

Ten lots which fronted on this canal were sold by the partnership in the latter part of 1949. The total sales price on these lots was $20,800. The 175½ acres originally purchased, less the lots sold by the partnership, will hereinafter be referred to as the "red" property. This property, according to the subdivision plat, contained 302 lots, of which 297 were to be waterfront lots, i. e., lots fronting on Naples Bay or on canals to be constructed inland from the Bay.

At the time the original tract was purchased in May 1949, Watson had a listing of certain other property which was owned by Rust. This property, hereinafter referred to as the "green" property, adjoined the red property on the west and consisted of 21.6 acres. The green property was higher land and required less fill than the red property; it fronted on the main street which went "down to Naples." However, it was not waterfront property. Rust's asking price on the green property as of May 1949 was $44,000. The property remained unsold until April 1950, at which time it was purchased by the Walkers for $44,000.

The Walkers caused the petitioner to be organized as a Florida corporation, the charter bearing filing date of December 16, 1949. The certificate of incorporation filed with the State of Florida provided that the amount of capital with which the petitioner would begin business would be $500. The organization was not completed until January 10, 1950, and prior to that date the petitioner was dormant as it had no assets and conducted no business. Aside from the tax advantages to be gained, the principal purposes for incorporation were to facilitate the raising of capital and to expedite and simplify the processes incident to the sales of lots.[1]

The first meeting of petitioner's incorporators was held at 10 a. m. on January 10, 1950, at the offices of petitioner's attorney. At this meeting the charter was accepted and the directors named therein were recognized and confirmed as the first directors of the corporation. No stock was issued by petitioner prior to January 10, 1950. A special meeting of petitioner's board of directors was held immediately after the incorporator's meeting of January 10, and at this meeting it was resolved to issue 30 shares of petitioner's no-par common stock at a stated price of $320 per share as follows:

| Shareholder | Number of shares |
| --- | --- |
| Forrest Walker | 10 |
| James L. Walker | 10 |
| Robert L. Walker | 10 |

[1] In this connection one of the witnesses testified: "* * * [when] we sell real estate to people that are down in * * * South Florida, well, they are anesthetized to a certain extent by the climate, by the waving palm fronds and the gentle breezes, the surf and all this, that and the other, they are ready to buy right now. If you let them * * * get back up north, I assure you you lose the greater portion of them, so if it is necessary to go out and hunt up six people to affix their names to a deed of conveyance, you'd lose I'd venture to say 90% of your prospects * * *."

The corporate minutes of this meeting also reflect the following:

Forrest Walker, James L. Walker and Robert L. Walker, offered to sell to the corporation the land in Naples, Florida, acquired by them from Philip G. Rust and Eleanor F. Rust, by deeds dated May 14th, 1949, less two small tracts of such land heretofore sold by the Messrs. Walker. The sales price to be $250,000.00. Terms: $9,000.00 cash, the corporation to assume five mortgages on the land on which $47,500.00 principal remains unpaid together with accrued interest amounting to $1,628.88—total $49,128.88. The balance of $191871.12 [*sic*] to be payable in five equal annual installments beginning January 10th, 1951, with interest from January 10th, 1950, at the rate of 4% per annum, payable annually on the aniversary [*sic*] date of principal installments. The Messrs. Walker presented a form of proposed contract to carry out the sale. Whereupon, on motion duly made and carried, the offer was accepted and the President was authorized and directed to take all necessary steps to effect the purchase of the land on the terms and conditions of the proposed contract.

On January 10, 1950, the Walkers, doing business as "Walker Developments," joined by their respective wives, executed a deed of the red property to petitioner. This deed was recorded on January 12, 1950, with the clerk of the Circuit Court of Collier County, Florida. Florida law requires that documentary stamps be affixed to all deeds of real estate at the rate of 10 cents for each $100 of sales price or fraction thereof. At the time of this recordation the Walkers had little cash available and, consequently, only a single 10-cent State documentary stamp was affixed to the deed. Subsequently on August 29, 1953, after the revenue agent had commenced his investigation and had mentioned this fact to the Walkers, an additional $221.10 in Federal documentary stamps and $250 in State documentary stamps were affixed to the deed and it was recorded a second time. By a contract executed on January 10, 1950, between the Walkers and petitioner, it was provided as follows:

The sales price of the land is $250,000.00. Terms of sale are: $9,000.00 cash paid, the receipt whereof is acknowledged by the Sellers; assumption of balance of $49,128.88 owing on the mortgages, leaving an unpaid balance of $191,871.12.

The said unpaid balance of $191,871.12 shall be paid by the Purchaser to the Sellers in five equal annual installments, the first installment becoming due January 10th, 1951. Unpaid balances of principal shall bear interest from January 10th, 1950, at the rate of 4% per annum, payable annually on the aniversary [*sic*] date of principal installments.

The Purchaser will (a) Make all payments of principal and interest on said five mortgages promptly when the same shall become due; (b) Pay all taxes and assessments levied against the land for the year 1950 and subsequent years before the same shall become delinquent; and (c) As to the balance of the sales price—$191,871.12—, pay all principal installments, with interest, promptly when the same shall be due. And should the Purchaser in anywise fail in any of these respects for a period of 60 days, the Sellers may, at their option, declare any sums of money owning [*sic*] to them hereunder to be forthwith due and payable.

On the same date (January 10, 1950) three checks payable to petitioner were drawn on the partnership bank account in the amount of $3,200 each. These checks were deposited in the petitioner's bank account in alleged payment for the shares of stock issued to the Walkers. Shares of stock held by the Walkers were classified as a partnership asset in the partnership returns for the years 1950 to 1955, inclusive. On the same date the petitioner drew a check to the order of the partnership in the amount of $9,000 in alleged downpayment on the alleged sale. This check was deposited in the partnership bank account.

In the partnership return of Walker Construction Company for the year 1950 the transfer of the red property to the petitioner was reported as an installment sale giving rise to a long-term capital gain. In the schedule attached to the return, the deferred balance due was shown as follows:

| Due date Jan. 10 | Amount due |
| --- | --- |
| 1951 | $39,192.78 |
| 1952 | 47,967.78 |
| 1953 | 47,967.78 |
| 1954 | 47,967.78 |
| | [1] 183,096.12 |

[1] A discrepancy in the amount of $8,775 exists between the amount shown on the 1950 partnership return and that shown in the agreement. Apparently, the petitioner assumed the partnership's obligation to Watson in the amount of $8,775.

No payments had been made on any of the deferred balances as of December 31, 1954. The statutory notice of deficiency was mailed to petitioner on September 1, 1954.

No principal or interest payments were made by the petitioner on the alleged obligation of $183,096.12 in 1951, 1952, 1953, or 1954. A payment in the amount of $26,888.06 was made in 1955.

The amount payable to Walker Construction Company was charged on the books to notes payable in the amount of $191,871.12. Of this amount $8,775 was reflected as a note payable to Edwin Watson, and the balance as a note payable to Walker Construction Company. No notes were ever executed by petitioner for the unpaid balance.

After the transactions of January 10, 1950, had been entered, the petitioner's books and records reflect the following opening balance sheet:

| Assets: | |
| --- | --- |
| Cash in bank | $600.00 |
| Land ["red" property] | 250,000.00 |
| Total assets | 250,600.00 |

Liabilities and Capital:

| | |
|---|---|
| Mortgages payable to Rust | $47, 500. 00 |
| Accrued interest on Rust mortgage | 1, 628. 88 |
| Contract payable to Walker Construction Company on land purchase | [1] 191, 871. 12 |
| Total liabilities | 241, 000. 00 |
| Capital stock outstanding | 9, 600. 00 |
| | 250, 600. 00 |

[1] Apparently $8,775 was actually payable to Watson. See footnote to preceding table.

Since January 10, 1950, petitioner has been continuously and actively engaged in subdividing, improving, and marketing the land acquired from the Walker partnership and other land thereafter acquired. It was apparent at the outset that the development of the property would require considerable capital. For example, advertising expenses for the period 1950–1955 amounted to approximately $27,500. The cost of dredging and filling would be approximately $200,000. From time to time the petitioner borrowed sums secured by mortgages on its real estate. A detail of such loans and mortgages is as follows:

| Date of mortgage | Mortgagee | Amount |
|---|---|---|
| May 11, 1950 | Bank of Everglades | $18, 500 |
| Feb. 9, 1951 | Bank of Everglades | 16, 000 |
| May 23, 1951 | Bank of Everglades | 25, 000 |
| Nov. 9, 1951 | D. W. McLeod and wife | 18, 000 |
| Oct. 1, 1952 | Bernard E. Shellhorn | 10, 000 |
| Dec. 21, 1953 | Bernard E. Shellhorn and wife | 30, 000 |

All of the above mortgages were recorded among the Public Records of Collier County, Florida, with the exception of the McLeod mortgage, which was unrecorded. McLeod and Shellhorn were friends of the Walkers'. Interest payments of 10 per cent were made on the McLeod mortgage until 1955, and interest payments of 7 per cent were paid on the Shellhorn mortgage. No repayment of principal has been made or requested on the McLeod mortgage.

On at least two occasions Forrest Walker advanced funds to the petitioner. On July 1, 1952, he advanced $10,000 for which the petitioner issued its demand note bearing 6 per cent interest. The reverse side of this note indicates that payments were made on January 28, 1953, in the amount of $2,000; on February 22, 1953, in the amount of $2,000; and on April 30, 1953, in the amount of $5,000. On July 24, 1953, Forrest Walker advanced $10,000 to the petitioner, for which the petitioner issued its demand note payable to Forrest Walker and his wife bearing 6 per cent interest, payable

annually. Substantial payments were made on both of these notes prior to any payment under the purported contract of sale. Forrest Walker required that the petitioner execute notes at the time he advanced funds to the corporation in order "to be protected."

Prior to the completion of the revenue agent's examination of petitioner's returns in June 1953, no payment had been made by petitioner on the principal or interest allegedly due to the partnership. The interest due was accrued on the petitioner's books and was deducted by petitioner in arriving at taxable income in each of the years involved herein. The interest deducted in the petitioner's return was not included as income in the Walkers' returns. In the notice of deficiency the respondent disallowed the interest deduction claimed by the petitioner in its returns for the years 1950, 1951, and 1952. The petitioner concedes the propriety of this adjustment. The Walkers never considered taking action against the petitioner for the amounts allegedly past due under the terms of the purported contract of sale.

The transaction of January 10, 1950, did not create a bona fide debtor-creditor relationship between the petitioner and the Walkers.

The transaction of January 10, 1950, was in substance a transfer of property solely in exchange for stock of the petitioner, and is governed by the provisions of section 112 (b) (5) of the Internal Revenue Code of 1939. The basis to the petitioner is the same as the basis in the hands of its transferor prior to the exchange, pursuant to section 113 (a) (8), 1939 Code.

### OPINION.

KERN, *Judge:* The issue before us arises from respondent's determination that "the basis of land conveyed [to petitioner] by the contract [of January 10, 1950] * * * should be determined in accordance with the provisions of section 113 (a) (8) of the Internal Revenue Code,[2] and that such basis amounts to $69,291.83 [*sic*] [3] in-

---

[2] SEC. 113. ADJUSTED BASIS FOR DETERMINING GAIN OR LOSS.

(a) BASIS (UNADJUSTED) OF PROPERTY.—The basis of property shall be the cost of such property; except that—

* * * * * * *

(8) PROPERTY ACQUIRED BY ISSUANCE OF STOCK OR AS PAID-IN SURPLUS.—If the property was acquired after December 31, 1920, by a corporation—

(A) by the issuance of its stock or securities in connection with a transaction described in section 112 (b) (5) (including, also, cases where part of the consideration for the transfer of such property to the corporation was property or money, in addition to such stock or securities), or

(B) as paid-in surplus or as a contribution to capital, then the basis shall be the same as it would be in the hands of the transferor, increased in the amount of gain or decreased in the amount of loss recognized to the transferor upon such transfer under the law applicable to the year in which the transfer was made.

[3] It is stipulated that the adjusted basis of this property to the partnership was $69,291.93.

stead of $250,000 as claimed." To sustain his position that this land was property acquired by petitioner corporation "by the issuance of its stock or securities in connection with a transaction described in section 112 (b) (5) * * *,"[4] respondent argues that neither the alleged downpayment by petitioner nor the alleged indebtedness of petitioner was bona fide, that in reality the land was exchanged solely for petitioner's stock and that "consequently, the transaction falls squarely within the provisions of Section 112 (b) (5)."

With regard to the alleged downpayment, respondent's position is that the drawing of the checks on the partnership bank account to the order of petitioner in the total sum of $9,600 and the simultaneous drawing of petitioner's check to the order of the partnership in the amount of $9,000 and its deposit in the latter's bank account, constituted in reality only a contribution to petitioner's capital in the net amount of $600 and "that no down payment on the alleged purchase price was actually made," citing *Gunby* v. *Helvering*, 122 F. 2d 203, reversing 41 B. T. A. 884; *Hoboken Land & Improvement Co.*, 46 B. T. A. 495, affd. 138 F. 2d 104; *Walter S. Heller*, 2 T. C. 371, affd. 147 F. 2d 376, certiorari denied 325 U. S. 868.

With regard to the alleged indebtedness of petitioner to its controlling stockholders, respondent's position is that there was no real or bona fide debtor-creditor relationship created by the transactions of January 10, 1950, since no such relationship was intended, since the formal capital of petitioner was obviously inadequate on that date to carry out the planned activity of petitioner and the ratio of its debt to capital was excessive, since the proprietary interests in petitioner were in the same proportions as the claimed indebtedness, since the payments on the alleged indebtedness were not enforced upon default but were postponed and for all practical purposes were subordinated to the claims of other creditors, since the alleged indebtedness was not secured, and since the alleged purchase price of the property to petitioner for which the indebtedness was incurred was substantially disproportionate to the fair market value of the property alleged to have been sold to petitioner. Among other cases, respondent cites *Gooding Amusement Co.*, 23 T. C. 408, affd. 236 F. 2d 159, certiorari denied 352 U. S. 1031; *Sarkes Tarzian, Inc.* v. *United States*, 240 F. 2d 467;

---

[4] SEC. 112. RECOGNITION OF GAIN OR LOSS.

(b) EXCHANGES SOLELY IN KIND.—

* * * * * *

(5) TRANSFER TO CORPORATION CONTROLLED BY TRANSFEROR.—No gain or loss shall be recognized if property is transferred to a corporation by one or more persons solely in exchange for stock or securities in such corporation, and immediately after the exchange such person or persons are in control of the corporation; but in the case of an exchange by two or more persons this paragraph shall apply only if the amount of the stock and securities received by each is substantially in proportion to his interest in the property prior to the exchange. * * *

*Alfred R. Bachrach*, 18 T. C. 479, affd. 205 F. 2d 151; *Colony, Inc.*, 26 T. C. 30; *Emanuel N. (Manny) Kolkey*, 27 T. C. 37; *R. M. Gunn*, 25 T. C. 424, affirmed per curiam 244 F. 2d 408, certiorari denied 355 U. S. 830; and *Isidor Dobkin*, 15 T. C. 31, affd. 192 F. 2d 392.

In the alternative and without regard to sections 113 (a) (8) and 112 (b) (5), respondent contends that the fair market value of the property "sold" to petitioner on January 10, 1950, had a fair market value on that date of $69,291, and that when petitioner's stockholders purported to sell it to petitioner for $250,000, "the property acquired takes as its basis the fair market value at the time of acquisition," citing *Majestic Securities Corporation*, 42 B. T. A. 698, affd. 120 F. 2d 12; and *Mountain Wholesale Co.*, 17 T. C. 870.

Petitioner contends that all of the transactions were undertaken and accomplished in good faith and were in substance what they were in form. It cites and heavily relies on the case of *Sun Properties, Inc* v. *United States*, 220 F. 2d 171. It also contends that the uncontradicted testimony of several expert witnesses demonstrates that the property here involved had a fair market value on January 10, 1950, equal to or in excess of the purchase price of $250,000.

Since the relationship between the alleged purchase price of the property and its fair market value is a factor relied upon by respondent in his primary contention under section 112 (b) (5), we shall consider that question now even though it is more fully discussed by respondent by way of an alternative argument.

A consideration of the two cases cited by respondent indicates that it is not necessary for us to find that there is an exact equivalence of purchase price to fair market value before we can conclude that there is a bona fide sale to the corporation for the price stated. Rather, we must find that the assets acquired by the corporation were not "so manifestly less in value than the value of the consideration claimed to have been paid therefor that such consideration must be presumed to have been paid for something more than the mere assets received." *Mountain Wholesale Co., supra* at 874, 875. In that case, "[n]o ordinary business man in his right mind" would have paid the price recited in the instrument of sale for the mere assets received. In the other case cited by the respondent the assets acquired by the corporation were listed securities which could have been readily purchased on the open market at prices greatly less than those alleged to have been paid to the corporation's stockholders.

In this case we are concerned with the fair market value of Florida resort real estate. It is obvious that the valuation of this commodity cannot be made with the exactness with which one might value commercial paper or listed securities. Furthermore, it is a commodity the value of which is far from static. This would be particularly

true in the instant case where the character of the real estate changed from a mangrove swamp as it was in May 1949 when it was acquired by the partnership, to a residential subdivision partially developed according to a plan, novel in that part of Florida, which resulted in practically all of the lots being waterfront property, as it was when acquired by the corporation in January 1950. Also, the record indicates that there was an increase in the demand for residential property in the Naples area in the latter part of 1949. That there was a demand for such property at that time is shown by the sales of 10 lots by the partnership shortly after the development was started at an average price of over $2,000 a lot. Over 300 lots remained unsold in the subdivision when the property was acquired by the corporation. On these facts and the testimony of real estate experts adduced by the petitioner, we are unable to conclude that the value of the real estate acquired by the corporation was "manifestly less in value" than $250,000 on January 10, 1950.

Therefore, in considering respondent's primary contention that the transaction here in question was in reality an exchange of property for stock within the meaning of section 112 (b) (5), we shall assume that the "price" of $250,000 provided by the contract of January 10, 1950, was approximately equivalent to the fair market value of the property as of that date.

However, even though we consider this factor of value in a manner favorable to petitioner, we must conclude because of the presence of other factors that there was in reality no cash downpayment and no true debtor-creditor relationship between petitioner and the partners, and that, to the contrary, there was in substance an exchange by the partners of property in return for a proprietary equity in the corporation equivalent for tax purposes (which are concerned with economic realities) to a transaction covered by the provisions of section 112 (b) (5).

With regard to the alleged "downpayment," it is stipulated that all of the checks were drawn and deposited to the bank accounts of the respective drawees on the same date, January 10, 1950. The petitioner has not proved that the partnership's bank account contained funds on that date (without reference to petitioner's check to its order apparently simultaneously deposited in the partnership account) to cover in full the three checks drawn by the partners to petitioner. The only evidence in the record concerning the cash position of the partnership on that date is that its funds were so low that the proper amount of stamps was not affixed to the contract executed by the parties on that date. Petitioner having the burden of proof throughout in this case, we must assume, as respondent contends, that the

exchange of checks was a "wash out" transaction which in reality resulted in nothing more than a contribution to petitioner's capital by the three partners in the net total amount of $600. Since petitioner's check to the partners in the amount of $9,000 could be paid only if the checks of the partners to it in the amount of $9,600 were paid and they in turn could be paid in full only if the petitioner's check was paid, we consider that petitioner's check purportedly a "down payment," should be ignored in considering whether the transaction amounted to an exchange pursuant to section 112 (b) (5), under the rationale of *Gunby* v. *Helvering, supra.*

With regard to the alleged "indebtedness," we consider that the following pertinent factors require a conclusion in favor of respondent:

In the instant case three partners were equal owners of a large tract of land for which they planned an extensive and expensive development. They had a small amount of cash, so small in fact that they found it difficult to buy stamps for a deed. It was decided by them to form a corporation in which their proprietary interests would be the same as in the partnership and to convey the land to the corporation. The cost of dredging and filling the land might be reasonably anticipated to be in excess of $200,000. In addition, expenditures were necessary for advertising. As a result of the transactions of January 10, 1950, including the exchange of checks between the partners and their controlled corporation, the petitioner started business with $600 cash capital and the land encumbered by recorded purchase money mortgages in the amount of approximately $50,000. By contract petitioner purportedly indebted itself to the partners in the sum of $191,871 payable in 5 equal annual installments beginning January 10, 1951, with 4 per cent interest from January 10, 1950. No notes were given by petitioner to evidence this "indebtedness" and no security was given therefor. It was contemplated and intended that the working capital necessary for the development and operation of petitioner's business would be obtained by mortgage loans to which this "indebtedness" to the partner-stockholders would be subordinate. It was also contemplated and intended that this "indebtedness" would be paid to the grantor-stockholders only if and when the profits resulting from the operation of petitioner's business permitted such payments. None of the installment payments called for by the contract were made by petitioner when due, and all were in default when the notice of deficiency was issued herein. Subsequently, a payment was made by petitioner in an amount less than the accumulated "interest." At no time did the partner-stockholders take any steps or contemplate taking steps to collect this "indebtedness" from petitioner.

While none of these factors *considered separately* would require a conclusion that the transaction here involved was in reality a section

112 (b) (5) exchange, cf. *Sun Properties, Inc.* v. *United States, supra,* it is our opinion that all of these factors *considered together* require such a conclusion.

We are not unmindful of the fact that some parts of the reasoning and language in *Sun Properties, Inc.* v. *United States, supra,* appear to be inconsistent with the result which we have reached here. However, it is axiomatic that each case of the type considered here must be decided on its peculiar facts. In our opinion the facts of the instant case *considered in their entirety* distinguish it from the case of *Sun Properties, Inc.,* and bring it within the ambit of the opinions of this Court and of the various Courts of Appeals which we have heretofore noted.

On the issue presented in this proceeding we decide in favor of respondent.

*Decision will be entered under Rule 50.*