Joe Goldstein and Lillian Goldstein v. Commissioner.
Goldstein v. Commissioner
Docket No. 71831.
United States Tax Court
T.C. Memo 1960-276; 1960 Tax Ct. Memo LEXIS 14; 19 T.C.M. (CCH) 1531; T.C.M. (RIA) 60276; December 27, 1960
*14 Petitioners, owning over 50 per cent of the stock of a family corporation, acquired real estate, on which the corporation held a very favorable long-term lease and on which it operated a market, for $35,000 and immediately resold it to the corporation for $75,000, offsetting the short-term gain against a capital loss carryover on their personal return. Held, the $40,000 profit realized by petitioners was a disguised dividend from the corporation and taxable to petitioners as ordinary income. Walter M. Campbell, Esq., Subway Terminal Building, Los Angeles, Calif., for the petitioners. Thomas F. Greaves, Esq., for the respondent. DRENNEN
Memorandum Findings of Fact and Opinion DRENNEN, Judge: Respondent determined a deficiency *15 in petitioners' income tax for the calendar year 1953 in the amount of $28,404.13. The only issue is whether a gain of $40,000, realized by petitioners on the sale of real estate, which they had purchased for $35,000 on December 8, 1953, to their family corporation for $75,000 on December 31, 1953, was taxable as ordinary income or as gain on the sale of a capital asset. Petitioners reported the gain as a short-term capital gain and offset it against a $112,944.77 capital loss carryover. Respondent determined that the gain was in the nature of a dividend and taxable as ordinary income. Findings of Fact Some of the facts were stipulated and are so found. Petitioners are husband and wife living in Los Angeles, California. They filed a joint income tax return for the calendar year 1953 with the district director of internal revenue for the district of Los Angeles. Joe Goldstein, the oldest of five brothers, the others being Max, Edward, Bernard, and Albert, started a retail grocery business as a sole proprietorship in 1925 when he was 17 years old. Joe gave each of his brothers his start in business by employing them in his expanding marketing business. On or before September 27, 1945, this *16 business became a limited partnership with Joe as the sole general partner, and Edward and Joe, as trustee for Max, as limited partners. The partnership operated under the name the Boys' Market. The Boys' Market, Inc., a California corporation, and hereafter referred to as the corporation, was incorporated in 1936 but was inactive until January 1, 1946, at which time all the assets of the limited partnership were transferred to it in exchange for capital stock of the corporation. On September 27, 1945, the limited partnership leased a parcel of land situate on the corner of a major intersection in San Gabriel, California, from Torley Land Company for a term of 50 years beginning November 1, 1945. Joe had previously attempted to buy the land for a market site but had been unable to agree with Torley on terms. The lease provided for rental of $40,000 payable in installments of $800 per year during the term thereof, and contained no provision for renegotiation. Among other things the lease required the lessee to construct on the property at its own expense a commercial business building costing at least $20,000. The building was to be completed by November 1, 1946; otherwise lessee *17 was required to post bond as security for completion of the building. All buildings constructed on the premises during the term of the lease were to become a part of the realty, to be delivered to the lessor upon termination of the lease. Lessee was required to pay all taxes, insurance, and other charges against the property. Lessee was entitled to assign the lease, provided that if the lease was assigned prior to completion of and payment for the original building, the lessee was to remain liable for the performance of all covenants of the lease as though no assignment had been made; if assigned after completion of the building the lessee would not, without the written consent of the lessor, be released or discharged from any obligations thereafter accruing. This lease was assigned to the corporation, along with the other assets of the partnership, in 1946. The lessor was notified of the assignment and its attorney acknowledged receipt of the notice by letter dated March 28, 1946, which also advised the partnership that it was not exonerated from its obligations under the lease and that lessor was not releasing the partnership. A market building was constructed on the leased premises *18 by the corporation sometime in 1947 or 1948 and was thereafter occupied by the corporation as one of its eight retail stores. From time to time after the lease was executed Joe unsuccessfully sought to purchase the fee in this land for the business. The minutes of a meeting of the board of directors of the corporation held on January 27, 1953, state that the president (Joe) reported that it might be possible to purchase the land on which the corporation built the San Gabriel market, and that the purchase of the land would enable "us" to procure a loan on the property and increase "our" working capital. The president and secretary were thereupon authorized to "make such purchase, if the price was satisfactory, and to arrange a loan on terms and conditions they deemed proper considering our loan agreement." The minutes of a subsequent meeting of the board of directors of the corporation held on April 28, 1953, after referring to the previous discussion about the possibility of purchasing the San Garbriel property, stated: "It has now been decided that Joe Goldstein and Lillian Goldstein would buy this land as their private property, and they may at some time in the future, sell it *19 to The Boy's Market." All of the directors were recorded as being present at this meeting. As a result of further negotiations with Torley Land Company sometime before June 22, 1953, Joe entered into an agreement with Torley whereby petitioners would buy a lot in Las Vegas, Nevada, where Torley's president lived, and build an apartment house thereon for a total cost to petitioners of $35,000, and upon completion of the construction petitioners would trade the Las Vegas property to Torley for the San Gabriel property with no cash involved. Escrows to carry out this agreement were executed on June 22, 1953, and Joe and Lillian put up $35,000 of their own money to carry it out. The transaction was completed on December 8, 1953, on which date Joe and Lillian conveyed the Las Vegas property to Torley Land Company, and received in exchange a deed for the fee to the San Gabriel property, subject to the lease held by the corporation. The transaction was worked out this way at the request of Torley Land Company which had a tax basis of a little over $10,000 in the San Gabriel property. On December 31, 1953, Joe and Lillian conveyed the San Gabriel real estate to "The Boy's Market, Inc. *20 ," by quitclaim deed, for the sum of $75,000 in cash, thus receiving $40,000 in excess of the cost to them of said property. There were no minutes recorded in the corporation's minute book which showed a consideration of or authorization for the consummation of this transaction by the board of directors of the corporation. During the year 1953 the corporation had issued and outstanding 5,500 shares of capital stock, which were held as follows: Number
Name
of shares
Joe Goldstein
2,720
Joe and Lillian Goldstein as joint
tenants
150
Lillian Goldstein as trustee for minor
children
36
Edward Goldstein (brother of Joe)
1,294
Max Goldstein (brother of Joe)
1,271
Dorothy Goldstein (wife of Bernard
Goldstein, brother of Joe) as trustee
for her minor children
24
Everett Eddy
5
Total
5,500 The officers of the corporation were: Joe Goldstein
President
Edward Goldstein
Vice president
Albert Goldstein
Vice president
Max Goldstein
Vice president
Everett Eddy
Secretary-treasurer
Bernard Goldstein
Asst. secretary-treasurer The directors of the corporation were: Joe Goldstein
Edward Goldstein
Lillian Goldstein
Albert Goldstein
Max Goldstein
Bernard Goldstein
Everett Eddy
*21 The five brothers worked in various supervisory capacities in the business, with Joe as the principal executive officer and general manager. The brothers received salaries from the corporation, and bonuses when profits justified them. Max, Edward, and Bernard obtained their stock in the company by investing their bonuses in the business from time to time. Albert, the youngest brother, never owned any stock. Everett Eddy was first employed as bookkeeper for the business in 1936. He acquired his shares of stock by gift from Max. As secretary-treasurer and a director of the corporation in 1953 Eddy was responsible for keeping the books and records of the company and for preparing minutes of the directors meetings. Some of the directors meetings were held informally as the brothers discussed matters among themselves in the offices of the corporation, and minutes of such meetings were not always recorded. At the more formal meetings of the directors Eddy took notes during the meeting from which he wrote up formal minutes within a few days to a month thereafter. The corporation was successful and had a "triple A" rating with Dunn & Bradstreet. It did not pay regular dividends and, *22 although it had net earnings for 1953, it did not formally pay a dividend that year. The corporation had accumulated earnings and profits and available cash in excess of $75,000 during the year 1953 and on December 31, 1953. The corporation entered into a loan agreement with Provident Mutual Life Insurance Company of Philadelphia in 1950 under which it borrowed $400,000, secured by a mortgage on all of its real estate and fixed property including the company office and the store in San Gabriel. The note agreement and mortgage contained certain restrictive covenants which, among other things, limited the corporation's borrowing and dividend activities to some extent. The transaction whereby petitioners acquired the San Gabriel property from Torley Land Company and immediately sold it to the corporation for a cash profit of $40,000 was not an arm's-length transaction. Of the $75,000 paid to petitioners by the Boys' Market, Inc., for the property in 1953, $40,000 was not in fact consideration for the sale or exchange of a capital asset; it represented a distribution of corporate earnings. Opinion The question is whether the $40,000 profit realized by petitioners on their sale *23 of the San Gabriel business property to their family corporation is taxable to petitioners as gain on the sale of a capital asset, or as ordinary income in the form of a disguised dividend. This is a question of fact and this case must be decided on its own particular facts. The fact that the transaction was not at arm's length is not in itself a basis for disregarding the form of the transaction but it invites careful scrutiny as to whether all phases of the transaction were in fact what they purport to be in form; and this is particularly true here where the principal stockholders of a family corporation resell property to the corporation at a profit of over 100 per cent a few days after they acquired it. Petitioners attempt to explain why the property was first acquired by petitioners and then sold to the corporation, rather than being acquired directly by the corporation, by evidence to the effect that Torley would not sell the property for cash but would only trade it for investment property in Las Vegas; that the brothers, as directors, would not permit the corporation to enter into such a transaction because, by reason of their own personal unpleasant experiences in Las *24 Vegas, they would have nothing to do with anything in Las Vegas; that it was against company policy to own the property on which its markets were located; that for some unexplained reason Eddy thought such a transaction might violate the corporation's loan agreement with Provident Mutual Life Insurance Company of Philadelphia; and that entering into this transaction might involve the corporation in interstate commerce which for some unexplained reason might affect the wages and hours of its employees. Petitioners further attempt to explain why they were so anxious to acquire this particular property, which the corporation held under a very favorable long-term lease, on the grounds that Joe was anxious to be relieved of the personal liability for performance of the lease which he had assumed as the general partner of the original lessee under the lease, and that the corporation was anxious to acquire the fee in the property so it could borrow money on it and could also use it for a sale and leaseback agreement with other parties. No effort was made by petitioners to justify the profit of over 100 per cent petitioners made by reselling this property to their controlled corporation *25 in the same month they acquired it, except to attempt to show that the property itself was worth $75,000 at the time. The only evidence of this value was the testimony of Eddy that he made some inquiry of the Bank of America as to the value of the property for loan purposes, and the testimony of an experienced independent appraiser who appraised the property a few days before the trial and gave his opinion that the value of the property as of 1953 was about $79,000. This witness gave no satisfactory explanation of the effect on this value of the lease which still had 42 years to run at an annual rental of $800, particularly to a prospective purchaser who held the lease. The evidence indicates that Joe himself would not pay more than $35,000 for the property because of the favorable lease. The corporation, as holder of the lease, should have been in a better position to bargain for the property than anyone else. It requires little analysis of the various reasons given to conclude that many of them are not only inconsistent with each other and implausible, but even if accepted as a whole would not reasonably explain why the corporation would refuse to enter into this transaction directly *26 with Torley but would be willing to let its president and principal stockholder buy the property for $35,000 and immediately resell it to the corporation for $75,000. Based on our examination of all the evidence and our observation of the witnesses on the witness stand, we are convinced that Joe Goldstein was the dominant character in the corporation, that he had control of its policies and made the executive and administrative decisions, that the other stockholders and directors owed their livelihoods to Joe and would have agreed that the corporation do anything legitimate that Joe suggested, and that the real reason the transaction here involved was carried out in the manner and on the terms described was to permit the corporation to acquire a higher tax basis in the San Gabriel property and at the same time permit Joe to withdraw $40,000 from the accumulated earnings of the corporation at a time when it could be offset against Joe's capital loss carryover and thus result in no tax to Joe. It is quite apparent that the objective of all concerned with the corporation was to get the title to the San Gabriel property in the corporation and that this could easily have been accomplished *27 in behalf of the corporation for $35,000, by use of an agent or someone acting for the corporation if necessary, without exposure of either the corporation or its stockholders to any of the alleged problems which worried them, and that a direct acquisition by the corporation would just as well accomplish the objectives of all parties as would the indirect transaction. We do not believe the corporation, with its favorable lease, would have paid $75,000 for this property to an outsider. This is supported by the fact that its president and principal stockholder, Joe, had refused to pay more than $35,000 for the property when negotiating in behalf of the corporation. We do not think the corporation would have paid more than $35,000 for the fee to this property. Consequently, we have found as a fact that only $35,000 of the $75,000 paid by the corporation to petitioners was consideration for the property, and that the remaining $40,000 was a disguised dividend to petitioners. It will be taxed accordingly. Albert E. Crabtree, 22 T.C. 61, affirmed per curiam 221 F. 2d 807 (C.A. 2, 1955); Sidney V. LeVine, 24 T.C. 147; H.K.L. Castle, 9 B.T.A. 931; *28 secs. 22(a) and 115(a), I.R.C. 1939. Cf. Palmer v. Commissioner, 302 U.S. 63. Sun Properties v. United States, 220 F. 2d 171 (C.A. 5, 1955), is heavily relied on by petitioners but is clearly distinguishable on the facts. The question there was whether the transfer of depreciable property to a wholly owned corporation was a sale or a contribution of capital. Here the question is whether a part of the sum paid by the corporation to the principal stockholder ostensibly as part of the purchase price of the land was in fact a disguised dividend. Accepting all the legal principles set forth in the Sun Properties case and applying those that are pertinent to the facts here would not, in our opinion, require a different conclusion than we have reached. The same is true of Warren H. Brown, 27 T.C. 27, also cited by petitioners. See Aqualane Shores, Inc. v. Commissioner, 269 F. 2d 116 (C.A. 5, 1959), affirming 30 T.C. 519, wherein the Court of Appeals for the Fifth Circuit distinguished its own Sun Properties case on the facts. It follows that respondent's determination of the amount of medical expense deductible is also *29 correct. Decision will be entered for the respondent.