William I. Winterburn and Jean T. Winterburn v. Commissioner.
Winterburn v. Commissioner
Docket No. 3717-66.
United States Tax Court
T.C. Memo 1968-187; 1968 Tax Ct. Memo LEXIS 105; 27 T.C.M. (CCH) 910; T.C.M. (RIA) 68187; August 29, 1968. Filed Harvey Bruce Mininberg, for the petitioners. James E. Merritt and Joel Sharon, for the respondent. Memorandum Findings of Fact and Opinion The Commissioner determined a deficiency of $9,205.37 in petitioners' income tax for the year 1962. The principal question is what part if any of the taxpayer's one-third share of gain on sale of certain property to a corporation is entitled to nonrecognition under sections 351 and 357, I.R.C. 1954. Findings of Fact The two stipulations of facts and the exhibits attached thereto are incorporated herein by this reference. Petitioners William I. and Jean T. Winterburn filed a joint income tax return for the year 1962 with the district director of internal revenue in San Francisco, California. On the date of the petition to this Court, the residence of Jean T. Winterburn was San Anselmo, California, and the residence of William I. Winterburn was San Rafael, California. Jean T. Winterburn is a party to this case solely by virtue of having signed the joint return; William I. Winterburn will sometimes hereinafter be referred to as "petitioner." On March 13, 1962, petitioner entered into *107 an agreement entitled "Offer to Purchase Real Property" with Lee Crane, Jr., Geraldine Crane (hereinafter referred to as "the Cranes"), Alfred Bettman and Maureen Bettman (hereinafter referred to as "the Bettmans") regarding two tracts of real property (hereinafter referred to as the "Walker Creek Ranch") located in Marin County, California. The agreement provided for the sale of the Walker Creek Ranch by the Cranes and the Bettmans to petitioner or his nominee for a total purchase price of $215,000. On the same date petitioner made a cash deposit of $3,000. The remainder of the purchase price was to be paid by the deposit of an additional $72,000 cash in escrow within 90 days, by the assumption of two notes secured by deeds of trust (held by one R.F. Weber) in the aggregate amount of $85,200, and by the giving of two additional notes secured by deeds of trust in the aggregate amount of $54,800 (one such note to the Cranes in the amount of $14,900 and the other to the Bettmans in the amount of $39,900). The Cranes agreed to enter into a 25-month lease at a total rental of $8,000. Petitioner was an officer in Pacific Coast Title Company. On March 21, 1962 he entered into an agreement *108 with Raymond J. Eckert, a real estate broker, and Frank E. Hawkins, a used car dealer, looking towards the consummation of the purchase of the ranch property and its exploitation for the benefit of all three ("the promoters") on an equal basis. The agreement recited that the promoters were "mutually desirous of contracting as between themselves, to undertake and consummate the purchase of said ranch property, as equal owners thereof, or in the alternative to sell the same to a corporation which the parties hereto may form for such purposes." Petitioner agreed to assign his rights to purchase the property to the group as a whole. The promoters agreed that each would contribute an equal amount of capital toward consummating the purchase, with petitioner to be "reimbursed" for his $3,000 down payment. They further agreed that each would be the beneficial owner of an undivided onethird interest in the property, with title to 911 be held by the Pacific Coast Title Company. Petitioner and Eckert authorized Hawkins to act as agent for the promoters in transferring title to the Walker Creek Ranch property. It was finally determined to organize a corporation to which the promoters would *109 sell the property at a profit, and it was contemplated that the corporation would obtain the necessary cash from the proceeds of sales of shares of its stock to various persons at $1,000 a share. To that end, the three promoters and 19 others executed a "Pre-Incorporation Subscription Agreement" on April 7, 1962 with regard to the formation of such corporation and the issuance of stock in order to obtain funds to purchase the ranch property. Each subscriber agreed to "take and pay for" the number of shares appearing after his signature, generally between 1 and 5, but 150 in the case of one subsciber. The agreement recited that Hawkins and his wife were the equitable owners of the property, and stated that it was "proposed that said corporation upon its formation shall purchase" the property from them for a total purchase price of $319,800. The price was to be paid by a cash payment of $179,800, by the assumption of the trust deed secured obligations owing to R.F. Weber in the amount of $85,200, and by the assumption of the trust deed secured obligations owing to the Cranes and the Bettmans in the aggregate amount of $54,800. The prepaid lease to the Cranes was to operate as a credit *110 toward the corporation's intended purchase of the property. It was further proposed that the corporation be authorized to issue 250 shares of $1,000 par value stock. Each promoter was to receive three shares of stock for promotional and other services. It does not appear that there was disclosure to the subscribers that petitioner of Eckert had any interest in the property or that the sales price to the corporation was $104,800 in excess of the price to be paid to the Cranes and the Bettmans. On April 30, 1962, articles of incorporation were filed with the Secretary of State of California for Walker Creek Ranch, Inc. The there promoters signed the document as incorporators and were listed therein as the first directors of the corporation. On May 7, 1962, escrow account number 6829-W was opened at Pacific Coast Title Company between Hawkins and the Cranes and the Bettmans. On May 14, 1962, escrow account number 7292-W was opened at Pacific Coast Title Company between Hawkins and Walker Creek Ranch, Inc. Payments by subscribers for capital stock in Walker Creek Ranch, Inc., were paid into this escrow account. On May 18, 1962, Walker Creek Ranch, Inc., applied to the Division of *111 Corporations, State of California, for a permit to issue securities. In the application, the three promoters, were listed as the permanent officers and directors of the corporation. On May 23, 1962, a permit to issue securities was granted to Walker Creek Ranch, Inc., by the Division of Corporations. Although some shares were sold to several persons in addition to the original subscribers, the latter did not in fact buy all the shares that they had undertaken to purchase. As a consequence, the corporation did not have sufficient cash to consummate the purchase, as previously planned. Accordingly, Hawkins, by letter dated May 31, 1962, authorized the corporation to substitute 91 shares of its stock for $91,000 of the cash to be paid by it for the property. It was thus contemplated that part of the sales price would be reflected in these 91 shares. However, at about that time 28 of those 91 shares were sold for $28,000 by Hawkins on behalf of the three seller-promoters, thus leaving only 63 shares to be distributed among them as part of the proceeds of sale of the ranch property to the corporation. The parties herein have presented by stipulation copies of escrow statements in both *112 escrow number 6829-W and escrow number 7292-W, dated May 7, 1962 and May 14, 1962, respectively. Each consists of two sheets, one sheet with respect to the account of the seller and the other with respect to the account of the purchaser. The accounts set forth in the statement relating to escrow number 6829-W, involving the sale of the property by the Cranes and Bettmans to Hawkins, are as follows: 912 *11 [Seller's Account]
Debit
Credit
Sale Price
$215,000.00
Internal Revenue Stamps
$ 143.00
Notary Fee 2 Deeds
4.00
Pay Brokerage To Timmer Realty
5,910.00
Lakeport Realty
5,910.00
By Assumption of Weber Note as of 7/1
85,200.00
By Note and D/T to Crane
14,900.00
By Note and D/T to Bettman
39,900.00
Credit buyer Crane lease
8,000.00
Credit buyer 5 mos. int. on Weber Note 2/1/62 to 7/1/62
1,307.50
By Check to Crane less $8,000.00 per lease contract
35,362.75
By Check to Bettman 18,362.75
TOTALS
$215,000.00
$215,000.00
[Purchaser's Account]
Purchase Price
$215,000.00
Notary Fee 2 Deeds of Trust
4.00
Recording 2 Deeds and 2 Deeds of Trust
15.40
Photostats and Maps
12.39
By Assumption of Weber loan as of 7/1/62
$ 85,200.00
By Note and D/T above to Crane
14,900.00
By Note and D/T above to Bettman
39,900.00
By Credit to Buyer for Crane lease
8,000.00
Credit buyer 5 mos. int. on Weber note
1,307.50
Credit for Deposit to: Broker
3,000.00
Balance to Close herewith 62,724.29
TOTALS
$215,031.79
$215,031.79
*113 The accounts set forth in the statement relating to escrow number 7292-W, involving the sale of the property by Hawkins to the corporation, are as fo/ows: *11 [Seller's Account]
Debit
Credit
Sale Price
$319,800.00
Internal Revenue Stamps
$ 198.00
Notary Fee
2.00
Transfer to Escrow 6829-W
62,724.29
Credit Buyer 5 mos. int. on Weber Note 2/1 to 7/1/62
1,307.50
By Assumption of Weber Loan as of 7/1/62
85,200.00
By Assumption of Crane Loan as of 7/1/62
14,900.00
By Assumption of Bettman Loan as of 7/1/62
39,900.00
Credit Buyer Crane Lease
8,000.00
Balance by Check to the undersigned [1] 107,568.21
TOTALS
$319,800.00
$319,800.00
[Purchaser's Account]
Purchase Price
$319,800.00
Title Insurance Premium
1,154.00
Recording Deed
3.60
Maps and Photostats
12.39
Cr. Buyer int. on Weber Note 2/1 to 7/1/62
[2] $ 2,307.50
By Assumption of Weber Loan
85,200.00
By Assumption of Crane Loan as of 7/1
14,900.00
By Assumption of Bettman Loan as of 7/1
39,900.00
Credit Buyer Crane Lease
8,000.00
Credit for Deposit to: Seller outside of escrow
91,000.00
Balance to Close herewith 79,662.49
TOTALS
$320,969.99
$320,969.99
*114 913 On June 1, 1962, the final transactions regarding the transfer of the Walker Creek Ranch property took place. Grant deeds were given to Hawkins by the Cranes and the Bettmans, deeds of trust were given by Hawkins to the Cranes and the Bettmans, and a grant deed was given by Hawkins to Walker Creek Ranch, Inc. It is not clear from the record whether at the closings the escrow arrangements were carried out precisely according to their terms. The parties have made the following stipulations regarding the ultimate results of the transfers of the Walker Creek Ranch property: 16. On June 1, 1962, $79,662.49 cash was transferred from escrow account number 7292-W. Of this amount, $64,724.29 [3] was transferred through escrow account number 6829-W to the Bettmans and the Cranes as part of the purchase price of the Walker Creek Ranch. The remaining balance of $13,568.21 (after payment of certain fees and expenses) was divided equally *115 between William I. Winterburn, Frank E. Hawkins and Raymond J. Eckert. 22. As a result of the foregoing transactions involving the formation of Walker Creek Ranch, Inc., William I. Winterburn received three shares of capital stock labeled as "promotional shares." He also received $13,933.33 in cash [4] and 21 shares of $1,000.00 par value capital stock of Walker Creek Ranch, Inc. The 21 shares of capital stock so received were Mr. Winterburn's one-third share of the 63 shares which remained after 28 of the 91 shares originally received by Mr. Hawkins on behalf of the three promoters had been sold for $28,000.00. In his income tax return for 1962, petitioner reported his part in the transfer of the Walker Creek Ranch property to Walker Creek Ranch, Inc., as follows. He reported short term gain of $31,933.33, the difference between the sale price of $106,600 (1/3 of $319,800) and his cost basis of $74,666.67. [5] He then subtracted $21,000, the claimed value of the 21 shares *116 received from $31,933.33 to arrive at a "taxable gain" of $10,933.33. The three promotional shares were reported in the return as ordinary income in the full amount of their par value, $3,000. In his notice of deficiency, the Commissioner determined that petitioner had understated his (recognizable) gain on the transfer by $21,000. He also made a resulting adjustment in petitioner's allowable medical deduction. Opinion RAUM, Judge: The presentation of this case has been marked by a certain amount of confusion, both in the development of the facts and the articulation of the legal theories involved. However, we think that the basic outline of the transactions involved is susceptible of intelligible restatement and that the proper legal conclusions emerge therefrom rather clearly. Petitioner contracted to buy the Walker Creek Ranch property for $215,000 from the Cranes and the Bettmans. Only $75,000 of the purchase price was payable in cash. The remaining $140,000 was to be paid by the assumption of an $85,200 liability on the outstanding Weber notes secured by deeds *117 of trust with respect to the property and by the giving of additional notes in the amount of $54,800 similarly secured. Petitioner thereupon entered into an arrangement with two others, Eckert and Hawkins, whereby all three became equally interested in the venture to acquire and exploit the property, and whereby Hawkins would act on behalf of all three. A plan was devised to sell the property for $319,800 to a corporation that would be organized for that purpose, and that would obtain the necessary funds by selling its stock to various persons at $1,000 a share. To that end the three promoters and some 19 other persons entered into a pre-in-corporation subscription agreement in which each party (or "subscriber") committed himself to buy a specified number of shares. The thought behind these steps was that the sale of the property to the corporation would yield sufficient cash with which to consummate the purchase from the Cranes and the Bettmans, as well as to leave the promoters with a $104,800 cash profit. In addition they were to receive three shares each for their promotional and other services. In order to coordinate the purchase of the property and its resale to the corporation, *118 two escrows were opened, one between Hawkins and the Cranes and the Bettmans (number 6829-W) to consummate the purchase of the property, and the other 914 between Hawkins and the corporation (number 7292-W) to effectuate its simultaneous resale to the corporation. It turned out, however, that although the corporation did sell a substantial number of shares (enough to provide cash to consummate the purchase from the Cranes and the Bettmans, and to leave some cash profit for the promoters), it had failed to sell enough shares to provide the full amount of cash originally contemplated. Accordingly, Hawkins, acting for the promoters, agreed to accept 91 unsold shares as part of the sales price. Meanwhile, 28 of those 91 shares were sold for cash (at par) to be added to the cash profits to be divided among the promoters, leaving 63 shares to be distributed to them, 21 for each. Thus, the upshot of these transactions was that (a) from the cash paid into escrow number 7292-W by the corporation, $64,724.29 was transferred to escrow number 6829-W to consummate the original purchase by Hawkins from the Cranes and the Bettmans; (b) the corporation acquired the property by purchase from *119 Hawkins, paying therefor in part by cash, in part by shares of its own stock, and in part by assuming notes in the aggregate amount of $140,000 that were given or assumed by Hawkins in his purchase from the Cranes and the Bettmans; (c) cash was distributed to each of the three seller-promoters, petitioner receiving an aggregate of $13,933.33; (d) 63 shares of the corporation representing part of the purchase price were distributed to the seller-promoters, petitioner receiving 21 shares; and (e) each promoter received 3 shares for promotional and other services. In setting forth the transaction in his 1962 return petitioner computed a shortterm gain of $31,933.33 [6] on the sale of his one-third interest in the property to the corporation, but he eliminated $21,000 therefrom (in respect of the 21 shares), relying on section 351, I.R.C. 1954, [7] and reported a "taxable gain" of only $10,933.33. The Commissioner restored the $21,000 thus eliminated and charged petitioner with the full amount of the $31,933.33 gain. We hold that the Commissioner's action was correct. *120 The first element of confusion in the legal principles involved is the Commissioner's shifting legal theory. Although he originally took the position that section 351 was not applicable at all to this case, he now states in his brief that he "no longer contends that the transfer * * * to [the corporation] * * * is not subject, in general, to the nonrecognition of gain provisions of section 351 * * *." This is a puzzling change of position. It seems clear that section 351 could not have any governing effect here in view of the fact that, on the evidence, the three seller-promoters emerged with considerably less than 80 percent of the stock in the corporation and thus did not have the necessary "control" of the corporation within the meaning of section 368(c) which is explicitly made applicable by section 351(a). [8] However, 915 even assuming that the transaction before us is otherwise within section 351, the Commissioner's determination must nevertheless be sustained by reason of subsection (b) thereof. *121 Subsection (b) provides that if the nonrecognition provisions of subsection (a) would apply to an exchange but for the fact that "other property or money" is received in addition to permissible securities, then - (1) gain (if any) to such recipient shall be recognized, but not in excess of - (A) the amount of money received, plus (B) the fair market value of such other property received; * * * Accordingly, to the extent that petitioner has received "other property or money," his admitted gain of $31,933.33 is not relieved of tax by section 351. Petitioner's confusion in applying section 351 lies in his assumption that the value of the stock received by him ($21,000) must be subtracted from his admitted gain to determine the amount of "taxable gain." No such procedure is authorized by the statute. Rather, the pertinent inquiry is to determine how much money or other property was received by him, and to treat his gain as recognized to the extent that he has received such money or other property. Therefore, if such money or other property was equal to or greater than his $31,933.33 gain, the entire amount of that gain must be recognized under section 351 (b)(1). In the first *122 place, petitioner received $13,933.33 in cash, which, standing alone, was more than the $10,933.33 which he treated as "taxable income" in his return. In the second place, petitioner's allocable one-third share of the cash amount of $64,724.29 in escrow number 7292-W which was transferred to escrow number 6829-W must be treated as cash received by petitioner. That $64,724.29 was part of the cash paid by the corporation to purchase the property from Hawkins, who was acting for all three seller-promoters. One-third of that amount, or $21,574.76, must therefore be ascribed to petitioner. It was just as much his as though it had been paid directly to him. It is a matter of no consequence that it was prearranged through the escrow device that his money would thus be used on his behalf to consummate his purchase of his one-third interest in the property from the Cranes and the Bettmans. Petitioner accordingly must be charged with $13,933.33 which he received directly in cash plus $21,574.76, his share of the cash paid into escrow number 7292-W which was used on his behalf by transfer to escrow number 6829-W, or an aggregate of $35,508.09. But this amount is in excess of petitioner's total *123 reported gain of $31,933.33, and this latter amount must therefore be held to be recognizable under section 351(b). By restoring the $21,000 to the gain which petitioner had eliminated in his return the Commissioner did nothing more than to rule that the entire gain of $31,933.33 was recognizable. His determination was correct and must be approved. Petitioner has made reference to section 357, suggesting that to the extent that cash from the corporation passed through the escrows to pay part of the purchase price to the Cranes and the Bettmans, such funds may not be treated as "money or other property" for purposes of section 351. There is no merit to the point. Section 357 does indeed provide that: SEC. 357. ASSUMPTION OF LIABILITY. (a) General Rule. - Except as provided in subsections (b) and (c), if - 916 (1) the taxpayer receives property which would be permitted to be received under section 351, * * * without the recognition of gain if it were the sole consideration, and (2) as part of the consideration, another party to the exchange assumes a liability of the taxpayer, or *124 acquires from the taxpayer property subject to a liability, then such assumption or acquisition shall not be treated as money or other property, and shall not prevent the exchange from being within the provisions of section 351. * * * Thus, the corporation's assumption of liability of $85,200 on the Weber notes and $54,800 on the notes given by Hawkins to the Cranes and the Bettmans may not be treated as "money or other property" under section 357. But the $64,724.29 cash actually paid by the corporation for the benefit of the three seller-promoters and used by them (through an escrow transfer) to discharge the liability under the purchase contract with the Cranes and the Bettmans stands on an entirely different footing. That liability could have been paid with any funds supplied by petitioner and his two co-venturers. It is a matter of indifference that by prearrangement funds paid for their benefit by the corporation were used for that purpose. The corporation neither assumed any liability of petitioner in respect of the cash required of him in the original purchase contract, nor did it in fact pay that liability. It merely made payment to Hawkins, acting for all three promoters, *125 by depositing cash in escrow, and it was Hawkins who, again acting on behalf of all three, arranged to have their money used to complete the original purchase from the Cranes and the Bettmans. Section 357 has no application to the facts presented here. Cases like Jewell v. United States, 330 F. 2d 761 (C.A. 9), and J. G. Stoll, 38 T.C. 223, relied upon by petitioner, are not in point. They involved the actual assumption of liabilities, like that on the notes herein which was indeed governed by the provisions of section 357; but such assumption of liabilities is sharply to be distinguished from the $64,724.29 item which in no way involves any assumption or payment of a liability by the corporation. Finally, petitioner makes a contention that the 21 shares of stock which he received "was watered stock and had no value for tax purposes." The precise thrust of this argument is not spelled out, but we think that the point is not well grounded. The record discloses litigation between certain stockholders and the promoters, in which petitioner and his co-defendants took the position that they had made a "bargain purchase" from the Cranes and the Bettmans. Although *126 the case was ultimately settled, leaving the matter unadjudicated, petitioner, who has the burden of proof herein, has certainly failed to establish that the property sold to the corporation was worth less than its sales price of $319,800, and there is therefore no basis for the contention in this Court that the stock was "watered." Moreover, the position that the stock had "no value" is utterly contrary to the evidence before us. The record shows that one of the stockholders resold a number of his shares for $1,200 each and that petitioner himself sold 20 of his shares in 1963 for $24,000, or $1,200 a share. An adjustment made by the Commissioner in petitioners' deduction for medical expenses is automatically controlled by the correctness of his determination in respect of the recognizable gain upon sale of the ranch property to the corporation. Decision will be entered for the respondent. Footnotes
1. The "undersigned" are Hawkins and his wife. ↩
2. There is an unexplained $1,000 discrepancy between this figure and the corresponding amount for interest in the seller's account in this escrow as well as in both accounts in escrow 6829-W.↩
3. The $2,000 discrepancy between this amount and that stated in the escrow accounts is unexplained.↩
4. The record does not disclose how this amount was computed or how it was distributed to petitioner.↩
5. The record does not disclose how this figure was computed, but the Commissioner has not questioned it.↩
6. The $31,933.33 gain was computed by subtracting $74,666.67 (the alleged basis of petitioner's one-third interest in the property) from $106,600 (his one-third share of the $319,800 sale price). Although his basis appears to be overstated by approximately $3,000, the Commissioner has not challenged the amount thus used, and we therefore proceed on the assumption that petitioner's gain was only $31,933.33. ↩
7. SEC. 351. TRANSFER TO CORPORATION CONTROLLED BY TRANSFEROR. (a) General Rule. - No gain or loss shall be recognized if property is transferred to a corporation by one or more persons solely in exchange for stock or securities in such corporation and immediately after the exchange such person or persons are in control (as defined in section 368(c)) of the corporation. For purposes of this section, stock or securities issued for services shall not be considered as issued in return for property. (b) Receipt of Property. - If subsection (a) would apply to an exchange but for the fact that there is received, in addition to the stock or securities permitted to be received under subsection (a), other property or money, then - (1) gain (if any) to such recipient shall be recognized, but not in excess of - (A) the amount of money received, plus (B) the fair market value of such other property received; * * *↩
8. Petitioner contended, relying upon George M. Holstein, III, 23 T.C. 923, that the transferors of "property" were not merely the three seller-promoters but also the various other stockholders who purchased stock for cash, and that all such transferors taken together had the necessary control. Holstein, however, is clearly inapplicable. In that case four persons contributed assets to a corporation (two of them contributing real estate and the other two cash) in exchange for all of its issued stock. We held that the transfers were governed by section 112(b)(5) of the 1939 Code, the predecessor of section 351 of the 1954 Code. Here, on the other hand, petitioner and the other two promoters sold their real estate to the corporation, receiving in payment cash plus stock to the extent that the corporation was unable to make full payment to them in cash. That this was regarded as a true sale is confirmed by the stipulated fact that the corporation in its own income tax return for 1962 reported a cost basis of some $320,000 for the property rather than the substituted basis that would have been required if this were a section 351 transfer. Although a bona fide exchange of property for stock under section 112(b)(5) of the 1939 Code or section 351 of the 1954 Code may sometimes be cast in the form of a sale, cf. Aqualane Shores, Inc., 30 T.C. 519, affirmed 269 F. 2d 116 (C.A. 5), no such exceptional circumstances are present here that would justify treating the sale before us as anything other than a sale. Of course, the mere fact that the Commissioner no longer relies upon the inapplicability of section 351 would not preclude this Court from approving the deficiency on that ground, for it is well established that the Commissioner's determination may be sustained on grounds other than those urged by him and that if the determination is correct it will be upheld even if he has relied upon the wrong reason to support it. Blansett v. United States, 283 F. 2d 474, 478-479 (C.A. 8): Bernstein v. Commissioner, 267 F. 2d 879, 881-882 (C.A. 5); Acer Realty Co. v. Commissioner, 132 F. 2d 512, 514-515 (C.A. 8); Alexander Sprunt & Son v. Commissioner, 64 F. 2d 424, 427 (C.A. 4); Crowell v. Commissioner, 62 F. 2d 51, 53 (C.A. 6); J. & O. Altschul Tobacco Co. v. Commissioner, 42 F. 2d 609, 610 (C.A. 5); Hughes v. Commissioner, 38 F. 2d 755, 757 (C.A. 10); Wilkes-Barre Carriage Co., 39 T.C. 839, 845-846, affirmed 332 F. 2d 421 (C.A. 2); cf. Helvering v. Rankin, 295 U.S. 123, 132-133↩.