Daro Corporation v. Commissioner.
Daro v. Commissioner
Docket No. 79069.
United States Tax Court
T.C. Memo 1961-309; 1961 Tax Ct. Memo LEXIS 40; 20 T.C.M. (CCH) 1588; T.C.M. (RIA) 61309; November 13, 1961
*40 1. Petitioner, on October 11, 1954, entered into an agreement with its president, Daugette, whereby for a consideration of $114,180, payable to Daugette on July 20, 1955, petitioner was granted the right to exercise an option owned by Daugette to purchase 132 residential lots. The transfer of said option was made by Daugette, as trustee for himself and four other stockholder-officers, in exact proportion to their stock ownership. The option agreement was dated June 25, 1954, and was transferred to petitioner about three months thereafter. The ultimate purchase price of the lots to be paid to the optionor by the optionee was fixed in the option agreement. Daugette paid nothing for the option itself, but together with other stockholders who had acquired an interest in the option, assigned it to petitioner for a price of $114,180 (in addition to which petitioner was obligated, on exercise of the option, to pay the purchase price of the lots in accordance with the terms of the option agreement). Petitioner was organized approximately three weeks after the option was acquired by Daugette. Petitioner exercised the option and included on its return for the taxable year ending March 31, 1956, as *41 part of its cost of land, the said payment of $114,180, and also deducted interest paid to its stockholders on the option indebtedness in the amount of $4,059.73. Petitioner was organized by Daugette with a paid-in capital of $1,000. When petitioner applied for a bank loan of $1,350,000 to build houses on the aforesaid lots, the bank insisted that the stockholders advance $100,000 to petitioner before the loan commitment would be made. The stockholders advanced said amount to petitioner in proportion to their stockholdings. Petitioner executed and delivered to stockholders its promissory note covering the $100,000 and paid the notes and interest thereon during the fiscal year ended March 31, 1956. Held: That the transfer of the option to petitioner was not a bona fide sale, and that petitioner overstated its cost of land by the amount of $114,180 on its return for the taxable year ending March 31, 1956. Held, further: That petitioner is not entitled to deduct interest payments of $4,059.73 on the alleged option indebtedness. Held, further: That the amount of $100,000 advanced to petitioner by its stockholders was a bona fide loan, and that the interest item attributable thereto in *42 the amount of $6,664 is allowable as a deduction. 2. Petitioner paid its officers salaries during the taxable year ending March 31, 1956, in the total amount of $54,900, of which respondent disallowed $15,750 as excessive. Reasonable amounts of salaries in controversy determined. Walter L. Mims, Esq., Massey Bldg., Birmingham, Ala., for the petitioner. J. L. Bailey, Esq., for the respondent. FISHER
Memorandum Findings of Fact and Opinion FISHER, Judge: Respondent determined a *43 deficiency in the income tax of petitioner for the taxable year ended March 31, 1956, in the amount of $71,850.40. The issues presented for our consideration are (1) whether petitioner overstated its cost of land for the year 1956 by including therein the amount of $114,180 paid for the purported purchase of an option right to purchase a tract of land; (2) whether petitioner is entitled to deduct interest expense of $4,059.73 paid to the owners of said option during 1956 under section 163 of the 1954 Code; (3) whether advances of $100,000 by petitioner's stockholders constituted a bona fide loan and, in conjunction therewith, whether the amount of $6,664 claimed to be attributable thereto as interest on said payment during 1956, was in fact interest expense under section 163, supra, during that year; and (4) whether certain salaries paid to petitioner's officers for employment during 1956 were unreasonable. Findings of Fact Some of the facts have been stipulated and, together with exhibits, are incorporated herein by reference. Daro Corporation, hereinafter sometimes called petitioner, is a corporation organized under the laws of Louisiana on July 14, 1954. Petitioner filed *44 its corporation income tax return for the fiscal year ended March 31, 1956, with the district director of internal revenue at New Orleans, Louisiana. Petitioner has an authorized capital stock of $10,000, being evidenced by 1,000 shares having a par value of $10 per share. One hundred shares of said stock were issued at the time of incorporation to the following stockholders in the amounts indicated: Stockholder
No. of
Par
Shares
Value
F. R. Daugette
58
$ 580
Alma H. Burke
25
250
M. H. Caraway
15
150
Lois T. Wood
1
10
M. B. Wintz
1
10
100
$1,000 All of the above stock was paid for in cash. No other shares were issued. Subsequent to the date of incorporation, but prior to October 14, 1954, the stock of said corporation was transferred to the following individuals who owned the stock on that date: Stockholder
No. of
Par
Shares
Value
F. R. Daugette
30
$ 300
M. H. Caraway
25
250
Frank Bainbridge
10
100
Claiborne Perrilliat
10
100
Stewart C. Holmes
25
250
100
$1,000
On or about June 25, 1954, (prior to petitioner's incorporation) F. R. Daugette, in his individual capacity, obtained an option from *45 St. Martin's Episcopal Church (hereinafter sometimes referred to as Church) to purchase 132 residential lots in Unit #3 of Green Acres Subdivision and substantial other real estate. Daugette paid nothing for the option. The option agreement states, in part, as follows: THIS AGREEMENT entered into on the 25th day of June, 1954, by and between the following: 1. ST. MARTIN'S EPISCOPAL CHURCH, herein represented by D. T. Manget, Jr., Agent and, 2. F. R. DAUGETTE, of the City of Birmingham, State of Alabama; WHEREAS, St. Martin's Episcopal Church is the owner of certain real estate situated in the Parish of Jefferson, State of Louisiana and more particularly described as GREEN ACRES UNIT NO. 3 * * *, and WHEREAS, the said St. Martin's Episcopal Church is the owner of what will be known as the proposed Green Acres Subdivision Unit No. 4, * * *, and WHEREAS, F. R. Daugette is desirous of entering into a purchase agreement with St. Martin's Episcopal Church for the purpose of purchasing certain properties located in both subdivisions, Units 3 and 4 of Green Acres Subdivision for the purpose of developing the said property with the construction of improvements to be located thereon; *46 IT IS HEREBY UNDERSTOOD AND AGREED between the parties hereto that St. Martin's Episcopal Church does hereby agree to transfer convey and assign to F. R. Daugette, or his nominee, upon the hereinafter set out terms, 132 residential building lots located in Unit No. 3 of Green Acres Subdivision, * * *. That in consideration of the sale and transfer of the said above described property, the said F. R. Daugette, or his nominee, does agree, subject to the terms and conditions hereinafter set forth, to pay to the said St. Martin's Episcopal Church the sum of $2635.00 per lot. The title to the said hereinabove described real estate shall be transferred, assigned and conveyed over to F. R. Daugette or his nominee by the St. Martin's Episcopal Church upon the payment of the sum of $100,000.00 by F. R. Daugette, or his nominee, which act of sale and transfer shall be made within thirty (30) days after the receipt by F. R. Daugette or his nominee of 132 FHA commitments from the Federal Housing Administration, in amounts satisfactory to F. R. Daugette or his nominee as hereinafter set forth; that for the balance of that purchase price the said F. R. Daugette or his nominee shall give unto *47 the St. Martin's Episcopal Church a vendor's lien and privilege first mortgage in payment of said balance; that the said balance of the said purchase price shall be paid in the following manner: That upon the construction of houses upon the said 132 lots the said St. Martin's Episcopal Church shall grant a partial release for each of said lots from the said vendor's lien and privilege retained by St. Martin's Episcopal Church for an amount in proportion to the balance due on the said vendor's lien and privilege; that the said vendor's lien and privilege first mortgage note to be executed shall in fact be paid in full within one (1) year from June 1st, 1954, whether the said lots have been sold with improvements or without improvements, or if said lots are unsold. The said vendor's lien and privilege shall carry the usual mortgage clauses in order to protect the St. Martin's Episcopal Church - to secure its vendor's lien and privilege retained by the said St. Martin's Episcopal Church. The said act of sale or sales shall be passed before vendor's notary, at purchaser's expense; all certificates to be paid by vendor; taxes to be prorated as of the date of the set of sale or sales; *48 all revenue stamps to be paid for by vendor. It is further understood and agreed that St. Martin's Episcopal Church does grant unto F. R. Daugette, or his nominee, an option which shall be for a period of ten (10) months from June 1st, 1954, on any unsold building lots remaining in the name of St. Martin's Episcopal Church at the time of exercising the option to purchase, in Unit 3 of St. Martin's Green Acres at the same price per lot as hereinabove enumerated, namely, the sum of $2635.00 per lot; that if the said option is exercised by F. R. Daugette or his nominee within the period of his right of option; that the full purchase price of the lots desired to be transferred to F. R. Daugette, or his nominee, shall be paid to the St. Martin's Episcopal Church at the time of transfer of the title to the said lots. It is further understood and agreed that the St. Martin's Episcopal Church does further grant unto F. R. Daugette, or his nominee, an option to purchase all residential building lots in Unit No. 4 of St. Martin's Green Acres * * *; the said option to purchase shall be exercised on or prior to fifteen months from June 1st, 1954, on the basis of $2735.00 per lot, which shall *49 include the cost of improvements. It is further understood and agreed that the St. Martin's Episcopal Church does hereby grant unto F. R. Daugette, or his nominee, the further right to purchase the squares designated as 1 and 3 of Unit No. 4, * * * the said option to purchase the said squares 1 and 3 of Unit No. 4, which are to be developed as commercial property, shall be on the basis of $91.91 per front foot and fronting on the proposed Veterans Memorial Highway, * * *. This option must be exercised within fifteen months from June 1st, 1954. It is further understood and agreed that F. R. Daugette or his nominee, if he or it shall exercise the option as to the residential and commercial property in Unit No. 4, shall have the right to exercise the option to purchase the residential property without purchasing the commercial property in Unit No. 4, but that he or his nominee shall not have the right to purchase the commercial property without purchasing the residential property. * * *
It is understood that F. R. Daugette, or his nominee, contemplates applying to F.H.A. for 132 commitments to enable him or it to finance and build houses and improvements on said 132 lots and *50 it is agreed that in the event the FHA fails or refuses to issue to F. R. Daugette, or his nominee, 132 FHA commitments in amounts satisfactory to F. R. Daugette, or his nominee, he or it shall not be bound by any terms and conditions herein set forth and shall not be bound to purchase any of said lots or to exercise any of the options or rights herein granted to him or his nominee. It is understood and agreed that within two months from the time of the exercising of the option to purchase by F. R. Daugette, or his nominee, as to the property in Unit No. 3, that St. Martin's Episcopal Church, at its cost and expense shall prepare and ready all of the said lots in accordance with FHA rules, requirements and specifications for the erection of houses and improvements thereon; that St. Martin's Episcopal Church will, at its cost and expense make and complete all land and site improvements, including blacktopping streets, concrete sidewalks, concrete curbs and gutters and storm and sanitary sewers, and lot fills and grading, and will at its cost and expense, install water, gas and electricity to each of the said lots purchased by F. R. Daugette, or his nominee, however, it is specifically *51 agreed and understood by and between F. R. Daugette, or his nominee, and St. Martin's Episcopal Church, that the blacktopping of the streets and the completion of the concrete sidewalks shall not be completed until it is mutually agreed upon between F. R. Daugette, or his nominee, and St. Martin's Episcopal Church in order to avoid the destruction of said improvements by the heavy traffic which will be using the said streets during the construction of the improvements on the said lots. It is further understood and agreed that St. Martin's Episcopal Church shall, however, complete the said improvements so that same will meet all of the requirements and rules, (both lot and subdivision requirements) of and be approved by the FHA and all governmental agencies having jurisdiction over said properties so that each of said lots shall be completed and ready for the erection of homes and improvements thereon under FHA rules and requirements. It is further agreed and understood that St. Martin's Episcopal Church, upon the conveyance of said lots to F. R. Daugette, or his nominee, shall pay and satisfy any and all liens against said lots, including all street, parish, municipal, and levee *52 district taxes and all paving or local improvement assessments and all liens, taxes and assessments of all kind and character, excepting vendor's lien and privilege first mortgage securing the balance of the purchase price due on said lots by F. R. Daugette or his nominee to St. Martin's Episcopal Church. Subsequent to June 25, 1954, but prior to September 10, 1954, Daugette transferred undivided interests in the ownership of said option to the following individuals, namely, M. H. Caraway 25 percent; Stewart C. Holmes 25 percent; and Frank Bainbridge 10 percent; and agreed with them that from that date forward he would hold said option as trustee for himself (40 percent) and the above-named. In addition, Claiborne Perrilliat received a 10 percent interest in that portion of the option transferred to petitioner to purchase the 132 residential lots. None of said individuals paid any cash consideration to Daugette for these interests. The agreement between Daugette and the others named in this paragraph states as follows: WHEREAS, under date of June 25, 1954, F. R. Daugette entered into a contract and agreement with St. Martin's Episcopal Church whereby he was granted the right and *53 option to purchase from said Church certain lots and properties therein described; and, WHEREAS, under date of October 11, 1954, said F. R. Daugette granted unto Daro Corporation, a corporation, the right to exercise the said option on 132 of the lots described in said option; and, WHEREAS, in obtaining said option from said Church and in giving said option to Daro Corporation, said F. R. Daugette was and is acting as Trustee for himself and the other parties hereinafter enumerated; and, WHEREAS, it is the desire of the parties that the interest of each in said options be set forth in a written instrument; NOW THEREFORE, said F. R. Daugette does hereby certify that in obtaining said option from said Church he acted as Trustee for himself and the following named parties, the interest of each party in said option being set forth below: F. R. Daugette
40%
M. H. Caraway
25%
Frank Bainbridge
10%
S. C. Holmes
25%
That in transferring said option on said 132 lots to Daro Corporation F. R. Daugette acted as Trustee for himself and the following named persons, the interest of each in said option being set forth below: F. R. Daugette
30%
M. H. Caraway
25%
Frank Bainbridge
10%
S. C. Holmes
25%
Claiborne Perrilliat
10%
*54 IT IS UNDERSTOOD AND AGREED that said Claiborne Perrilliat has no interest in the option given by said Church to F. R. Daugette and that he has the said 10% interest in the option given by F. R. Daugette to Daro Corporation on said 132 Lots. On September 10, 1954, Daugette entered into an agreement with petitioner wherein he agreed to sell the 132 lots to petitioner for $3,500 cash per lot. Petitioner was unable to pay $3,500 cash per lot. On October 11, 1954, Daugette, acting as trustee for himself and the other individuals named above, entered into a written agreement with petitioner whereby for a consideration of $865 per lot, payable to Daugette on July 20, 1955, petitioner was granted the right to exercise said option to purchase the said 132 lots. The remainder of the property described in said option was not included in this agreement. The agreement dated October 11, 1954, states, in pertinent part, as follows: WHEREAS, under date of June 25, 1954, F. R. Daugette, of Birmingham, Alabama, entered into a contract and agreement with St. Martin's Episcopal Church, whereby he acquired an option or right to purchase from said Church certain lots and properties therein described; *55 and WHEREAS, under date of September 10, 1954, F. R. Daugette entered into a contract and agreement with Daro Corporation, a Louisiana Corporation, wherein he agreed to sell 132 of said lots described in said option with said Church for $3500.00 cash per lot, said 132 lots being particularly described in said contract between F. R. Daugette and Daro Corporation, dated September 10, 1954; and, WHEREAS, Daro Corporation is unable to purchase said lots for $3500.00 cash per lot: NOW THEREFORE, It is mutually agreed by and between Daro Corporation and F. R. Daugette as follows: 1. Said agreement entered into by and between Daro Corporation and F. R. Daugette dated September 10, 1954, whereby F. R. Daugette agreed to sell said 132 lots to Daro Corporation for $3500.00 cash per lot be and the same is hereby cancelled and annulled. 2. F. R. Daugette does hereby give and grant unto Daro Corporation the right to exercise the said option F. R. Daugette has on said 132 lots under his contract with said Church by paying to said Church the sum of $2635 per lot. (The said option contemplates the blacktopping of the streets; if concrete is used in lieu of blacktopping the option price shall *56 be $2935.00 per lot.) 3. Daro Corporation agrees to pay to F. R. Daugette on July 20, 1955, the sum of $865.00 per lot for the right herein granted to exercise the said option on said 132 lots. * * *
No promissory note, mortgage, or other security was provided for in the aforesaid agreement to secure the corporate indebtedness. Petitioner carried the acquisition of said option on its books as an account payable to Daugette individually. Officers of Daro Corporation at the time of the alleged sale of the option involved herein were as follows: Name
Title
F. R. Daugette
President
Stewart C. Holmes
Vice-President
Claiborne Perrilliat
Vice-President
M. H. Caraway
Secretary-Treasurer
Petitioner made payments on said option as follows: Name
Option Payment
Interest
Date Paid
F. R. Daugette
$ 34,254
$1,217.92
December 27, 1955
M. H. Caraway
28,545
1,014.93
December 27, 1955
S. C. Holmes
28,545
1,014.93
January 2, 1956
F. Bainbridge
11,418
405.98
January 2, 1956
C. Perrilliat
11,418
405.97
January 2, 1956
$114,180
$4,059.73
On October 13, 1954, the following stockholders of petitioner loaned to petitioner *57 the amounts opposite their names. Thereafter, on August 31, 1955, petitioner repaid said amounts to the stockholders with interest. The loan was evidenced by promissory notes executed by petitioner and delivered to each of said stockholders. Interest
Total
Stockholder
Amount
Paid
Payment
F. R. Daugette
$30,000
$2,000
$ 32,000
M. H. Caraway
25,000
1,666
26,666
Stewart C. Holmes
25,000
1,666
26,666
Frank Bainbridge
10,000
666
10,666
Claiborne Perrilliat
10,000
666
10,666
$100,000
$6,664
$106,664
The promissory notes were identical except as to name and amount. The $100,000 loan was made at the insistence of Birmingham Trust National Bank. The bank refused to give petitioner a commitment for a loan in the amount of $1,350,000 unless the $100,000 loan was made to petitioner by the stockholders. Petitioner exercised the option to purchase the 132 lots on or about October 11, 1954, from St. Martin's Episcopal Church, the optionor, at a price of $2,845 per lot. The average appraised value of all of the residential lots covered by the aforesaid option as determined by the Veterans Administration was $3,766 per lot. The V.A. appraisal *58 takes into consideration the structure that will be placed on the lot from plans and specifications submitted with the application. After the acquisition of the aforesaid option, Daugette, in his own name, applied for FHA commitments on the 132 residential lots. Daugette was advised by FHA officials in Louisiana that in order to obtain the commitments it would be necessary to form a corporation. The option granted by the Church to Daugette was for the purchase of 424 residential lots and two business lots. Only the right to exercise the option on 132 lots was transferred to petitioner. The option on the remainder of the lots was subsequently sold to persons other than petitioner. After the transfer of the option right to petitioner, it contracted with Perrilliat-Rickey Construction Company for the construction of 132 residences on the lots for a contract price of $1,266,910.56. Petitioner obtained a loan commitment from the Birmingham Trust National Bank for $1,350,000. The FHA commitment was obtained by petitioner on September 20, 1954, in the amount of $1,959,250. Daugette gave petitioner his personal check to pay the costs of obtaining the FHA commitments, since petitioner *59 had no funds of its own with which to pay such costs. Petitioner's profit and loss statement on its return for the taxable year 1956 was as follows: Sale of Houses:
Green Acres - (132 Houses) Unit No. 3
$1,974,150.00
Costs and Expenses:
Construction Cost: Land (132 Lots)
$ 489,720.00
Construction contract
1,266,910.56
Gas installation contract
4,634.00
$1,761,264.56
Plans and specifications
750.00
Decorating
1,000.00
F.H.A. filing fees
5,480.00
Fee for commitments
14,411.00
Fee for construction loan
10,125.00
F.H.A. extensions
2,640.00
V.A. appraisal fees
542.00
Attorneys fees
1,440.47
Bookkeeping and accounting
600.00
Advertising
7,741.60
Automobile expense
1,047.73
Estimate fee
450.00
Travel expense
9,616.62
Insurance
604.88
Interest
45,432.22
Lights, heat and water
513.28
Office supplies and expense
2,556.34
Promotional
4,462.82
Sales commission
11,229.40
Telephone and postage
969.16
Liens - certificates and expenses to procure
2,006.00
Release of mortgage
1,957.00
Revenue stamps
2,209.80
Taxes - houses
2,693.70
Loan discount fee
6,655.50
Miscellaneous repairs and maintenance
2,041.21
Miscellaneous expenses
366.52
Directors fees
500.00
Salaries
54,900.00
Depreciation
493.42
Corporation franchise tax
29.18
1,956,729.41
Net profit
$ 17,420.59
*60 Petitioner's assets and liabilities shown on its return for the years ended March 31, 1955, and 1956, were as follows: Assets
March 31, 1955
March 31, 1956
Cash on hand and in bank
$ 5,981.75
$14,586.06
Notes receivable
5,163.18
Development in process
1,794,622.45
Deposits
30.00
Land
1,069.75
House (Minden, La.)
9,085.08
Automobile
$1,600.00
Furniture and fixtures
724.98
2,324.98
Less-Reserve for Depreciation
493.42
1,831.56
Organization expense
921.50
$1,800,604.20
$32,687.13
Deposits on houses
$ 2,700.00
Notes payable
Hibernia National Bank
843,971.00
Loans payable - officers
100,000.00
Accounts payable
852,933.20
$ 3,680.09
Notes payable - Blaylock Investment Co.
7,478.69
Accrued salaries
3,050.00
Accrued interest
52.88
Accrued taxes
4.88
Federal and state income tax payable
5,486.75
Capital
1,000.00
1,000.00
Surplus
11,933.84
$1,800,604.20
$32,687.13
Petitioner included in its cost of land on its return for 1956 a payment to its stockholders for the option in the amount of $865 per lot representing a total of $114,180 in excess of *61 the price per lot paid to the optionor. The price per lot paid to the optionor was $2,845. At the time the option to purchase was granted, and at the time the option was transferred to petitioner, the land was unimproved swampland and was below sea level. The fair market value of the 132 lots during the period from June 15, 1954, to October 11, 1954, was $2,845 per lot. Daugette has been in the general contracting business for about 24 years. His activities during that period included subdivision development and the buying and selling of real estate. His office is located in Birmingham, Alabama, and he has carried on business in Tennessee, South Carolina, Florida, and Louisiana. He was the organizer of petitioner and its president. Caraway is a professional estimator. He had a business of his own employing from 10 to 12 employees. Holmes was a general contractor, engineer, and draftsman. Perrilliat is a civil engineer engaged in the contracting business. He is also an employee, stockholder, and officer of Perrilliat-Rickey Construction Company. Bainbridge has been Daugette's lawyer for 15 years. Daugette, Caraway, and Holmes performed most of the executive functions of *62 petitioner. Daugette and Caraway devoted about 80 percent of their time and Holmes about 75 percent of his time to the affairs of petitioner. Daugette had no other employment or business during the year involved. Perrilliat spent most of his time as an employee of Perrilliat-Rickey Construction Company which was the general contractor for petitioner. He also spent week-ends and sometimes one day during the week on petitioner's project site. He helped in selling lots by pointing out the benefits of the lots to prospects. Daugette, Caraway, and Holmes participated in the submission of various applications to the FHA and VA. They had some assistance from Perrilliat in this corporate activity toward the last. Building plans for the homes built by petitioner were drawn by Daugette, Caraway, and Holmes with the assistance of one draftsman. Likewise, estimates of costs of building the houses were prepared by Daugette, Caraway, and Holmes. Most of the sales were made by Daugette, Caraway, and Holmes, although some sales were made through real estate agents to whom a total of $11,229.40 in commissions was paid. Said three executives and an independent architect also prepared monthly *63 progress estimates of costs on each house for each phase of construction in order to obtain the monthly draw of funds from the bank. Daugette, Caraway, and Holmes maintained daily and continuous supervision of construction. They also cooperated with FHA and VA officials on problems arising from inspections. Integrated into the work was the necessity of seeing to it that St. Martin's Church carried out the construction work called for in the option agreement, including pavements, gutters, and the like. As the houses were completed, they were advertised as a part of sales efforts. Caraway took over almost all of the advertising. The executives also wrote up sales contracts. All executives were available at the property on week-ends and, except for Perrilliat, were there almost all of the time including evenings. On its income tax return for the fiscal year ended March 31, 1956, the compensation paid to petitioner's officers is shown as follows: Amount of
Name and Address
Title
Compensation
F. R. Daugette,
Birmingham, Alabama
President
$18,000
Stewart C. Holmes,
Birmingham, Alabama
Vice President
10,800
M. H. Caraway,
New Orleans, Louisiana
Secretary-Treasurer
13,500
Claiborne Perrilliat,
New Orleans, Louisiana
Vice President
7,200
Frank Bainbridge,
Birmingham, Alabama
Vice President
5,400
*64 Of the salaries paid to petitioner's officers in the fiscal year ending March 31, 1956, the amounts allowed by respondent, and the amounts disallowed were as follows: Name
Salary
Allowed
Disallowed
Daugette
$18,000
$18,000
None
Caraway
13,500
6,750
$6,750
Holmes
10,800
5,400
5,400
Perrilliat
7,200
3,600
3,600
Bainbridge
5,400
5,400
None
Total
$54,900
$39,150
$15,750
The salaries of Caraway and Holmes in the respective amounts of $13,500 and $10,800 for the fiscal year in question were reasonable. Opinion Issue I. Cost of Land ($144,180) Respondent contends that petitioner overstated its cost of land for the taxable year 1956 by including therein the amount of $114,180 paid to its stockholders for the alleged purchase of an option right to buy 132 residential lots. Essentially, it is respondent's position that the alleged sale of the option was fictitious and constituted a capital contribution to the corporation. Petitioner, in opposition, maintains that its acquisition of the option was the result of a bona fide sale which created a valid debtor-creditor relationship. Respondent's determination is, of course, prima facie *65 correct, and the burden of proof is upon petitioner to establish error. Aqualane Shores, Inc., 30 T.C. 519, 528 (1958), affd. 269 F. 2d 116 (C.A. 5, 1959). Whether a stockholder's transfer of property to a corporation is to be deemed a bona fide sale or a capital contribution is primarily a question of fact to be determined by a consideration of all the attendant circumstances. The critical factor involved herein is not the formal designation of the option assignment, but rather the proper characterization of the underlying transaction and the relationship in fact created thereby. Intention of the parties as to the nature of the transaction is controlling and is to be gleaned from all of the pertinent factors in the particular case. Our inquiry is not limited to the formalities, however meticulously observed, in which the parties cast their transaction. See R. M. Gunn, 25 T.C. 424, 437 (1955), affd. per curiam 244 F. 2d 408 (C.A. 10, 1957), certiorari denied 355 U.S. 830. In considering the factors material to a determination of whether advances by stockholders to their corporation were to be deemed loans or capital *66 contributions, we said in Sam Schnitzer, 13 T.C. 43 (1949), affd. 183 F. 2d 70 (C.A. 9, 1950), at (p. 60): Bookkeeping, form, and the parties' expressions of intent or character, the expectation of repayment, the relation of advances to stockholdings, and the adequacy of the corporate capital previously invested are among circumstances properly to be considered, for the parties' formal designations of the advances [property or cash] are not conclusive, * * * but must yield to "facts which even indirectly may give rise to inferences contradicting" them. * * * We are mindful that, under proper circumstances, there may be a bona fide sale of property by a stockholder to his corporation without a cash payment at the time of transfer, and that such sale may give rise to a valid indebtedness to such stockholders. Ainslie Perrault, 25 T.C. 439, 451-452 (1955), affd. per curiam 244 F. 2d 408 (C.A. 10, 1957). We also recognize that the mere fact that the purpose of the transaction may be to minimize taxes does not of itself render the transaction ineffective if it is in all other respects a bona fide transaction. On the other hand, *67 a tax avoidance purpose is a factor to be considered in determining whether the transaction lacks genuineness and is in fact a sham. See Higgins v. Smith, 308 U.S. 473 (1940). And see 1432 Broadway Corporation, 4 T.C. 1158 (1945), affd. per curiam 160 F. 2d 885 (C.A. 2, 1947), where we said at p. 1165: Although a taxpayer has the right to cast his transactions in such form as he chooses, * * * the Government is not required to acquiesce in the taxpayer's election of form as necessarily indicating the character of the transaction upon which his tax is to be determined. * * * The Government is not bound to recognize as the substance or character of a transaction a technically elegant arrangement which a lawyer's ingenuity has devised. * * * Applying the foregoing criteria to the facts before us and examining the entire transaction, we must conclude that the transfer of the option right to Daro by its controlling stockholders was not a bona fide sale, but, rather, was in the nature of a capital contribution clearly lending itself to potential future tax avoidance. Succinctly stated, the record shows that on June 25, 1954, Daugette acquired *68 an option from St. Martin's Episcopal Church to purchase, inter alia, 132 residential lots at $2,635 per lot. Subsequently, it was agreed because of certain additional improvements to be made by the Church, that the price per lot would be $2,845. Daugette, as an individual, was unable to secure FHA commitments (which were only granted to corporations) and, therefore, on July 14, 1954, organized petitioner. On October 11, 1954, Daugette transferred to petitioner the right to exercise the option as to the 132 residential lots in question. The transfer of the right under the option was made by Daugette as trustee for himself and four other stockholders in exact proportion to their stock ownership. This agreement cancelled a previous agreement dated September 10, 1954, whereby petitioner was to pay $3,500 per lot, because petitioner was unable to purchase the lots for cash. Under the terms of the new agreement dated October 11, 1954, petitioner was to pay, on July 20, 1955, the sum of $865 per lot to the stockholders in excess of the purchase price of each lot required to be paid to the Church, or a total of $114,180. No certificates of stock or evidence of indebtedness of any kind were *69 given or issued by petitioner to Daugette (or to any of the stockholders for whom he was acting as trustee) for the option right involved. Petitioner purchased the 132 lots from the Church at $2,845 per lot. The total amount paid by petitioner, including the payment to the stockholders for assignment of the option right, was $3,710 per lot. On its return for 1956 petitioner included in the cost of land $114,180 paid to its stockholders for the option right. It is to be noted that the option was acquired at no cost by Daugette on June 25, 1954. Petitioner was organized on July 14, 1954, (about three weeks after the option was so acquired) because the FHA would only grant a loan commitment to a corporation. The option was assigned to petitioner on October 11, 1954, (about three months after petitioner was incorporated). The price (as adjusted) to be paid to the optionor was $2,845 per lot, but in addition, petitioner was required to pay to its controlling stockholders $865 per lot for the assignment of the option payment to be made on July 20, 1955. The only credible evidence of the value of the lots was the price to be paid to the optionor agreed to on June 25, 1954, in an arm's-length *70 transaction. There is no basis in the record for inferring that the value of each lot increased by $865 (or that the total value of the 132 lots increased by $114,180) over a period of less than four months. The opportunity for tax avoidance arises, in part, from the fact that an increase in petitioner's basis for the lots is calculated to decrease the anticipated profit from the sale of the lots and improvements thereon which would be taxable at ordinary income rates. In addition, it provides a device by which the controlling stockholders who were to receive the $114,180 might withdraw that amount from the corporation in a form taxable at more favorable rates than ordinary income. Daugette's testimony ascribing a value of $4,000 to each lot was at best his opinion but was also obviously biased. The VA appraisal is not helpful because it included as a factor the estimated cost of the ultimate structure to be erected on the lot. Moreover, the underlying facts on which it based its estimate are not in the record. Under the circumstances, we find the fair market value of the 132 lots during the period here significant to have been $2,845 per lot (being the same as the adjusted price *71 per lot payable to the optionor). In Wilhelmina Dauth, 42 B.T.A. 1181 (1940) where the sole stockholders sold securities to their controlled corporation above the fair market value thereof, we said (p. 1189): Where the facts show that the parties to a sale demonstrate such a lack of interest as to the price at which one sells to another that the buyer purportedly gives a sum greatly in excess of the worth of the property, such facts indicate that what was done was not a real business transaction and "was not intended to have the usual results and significance of a bona fide business deal." Pierre S. DuPont, supra, p. 1242. * * * Here, the stockholders were in a position to manipulate or inflate the cost of the option right to their wholly-owned corporation so as to place a substantial amount of corporate earnings beyond the reach of the taxing statutes. The corporation was obliged to accept the assignment of the option at a price over which it had no control. We recognize that the mere ability through stock ownership to control the financial transactions of the corporation is not sufficient of itself to require a sale otherwise unobjectionable to be treated as a *72 nullity for tax purposes. Under the circumstances of the instant case, however, we think the conclusion is unavoidable that an excessive price was placed on the option right by the controlling stockholders; that the price of the transfer of the option was arbitrarily fixed without reference to the fair market value thereof as of the date of its transfer to petitioner; and that the alleged consideration for the transfer of the option right to petitioner did not create a valid debtor-creditor relationship. Rubay Co., 9 B.T.A. 133, 139-140 (1927); Wilhelmina Dauth, supra, p. 1189. Another material factor indicating that a bona fide sale and indebtedness were not contemplated by the parties is the obviously inadequate capitalization of petitioner, one of the indicia from which the presence or absence of a debtor-creditor relationship may be determined. [1]Gooding Amusement Co., 23 T.C. 408, 419 (1954), affd. 236 F. 2d 159 (C.A. 6, 1956) certiorari denied 352 U.S. 1031 (1957). Manifestly, petitioner's paid-in capital of $1,000 was inadequate to pay $114,180 for assignment of the option right, to carry out the purchase *73 of 132 lots at $2,845 per lot, and to construct improvements thereon. When Daro had the opportunity on September 10, 1954, to purchase said lots at an over-all cash price of $3,500 per lot, the corporation was unable to do so because it did not have the cash. In order to finance the project Daro had to obtain a bank loan of $1,350,000, and in order to obtain said loan the stockholders were required by the bank to lend $100,000 to the corporation. Petitioner's undercapitalization is evident, and, together with the circumstances already discussed with respect to the transfer of the option, points to the conclusion that the transfer of the option to petitioner, assuming, as contended by petitioner that it had substantial value in excess of the required payments to the optionor, was at the risk of petitioner's business and was in substance a capital contribution by its controlling stockholders. See Arnold v. Phillips, 117 F. 2d 497, 501-502 (C.A. 5, 1941), certiorari denied 313 U.S. 583 (1941). *74 Furthermore, the fact that the transfer of the interest in the option was in exact proportion to each stockholder's original capital contribution to Daro and to the stock issued to each invites close scrutiny and suggests that a proprietary interest was intended. R. E. Nelson, 19 T.C. 575, 580 (1952). We note that there was no evidence of indebtedness, such as a note. Likewise, there was no provision for the payment of interest. Repayment of the alleged indebtedness was necessarily subordinated to the bank loan and the rights of the Church. Without the transfer of the option, petitioner would have been a mere shell. The prospect of payment of $114,180 to the stockholders when claimed to be due was clearly dependent upon and at the risk of the success of the business. There is no force to petitioner's argument that its assets in the form of FHA and VA commitments were more than adequate to commence and complete at a profit the project for which it was formed and that additional contributions of capital were not needed or wanted. A substantial amount of cash was required before the project could commence and petitioner's capital structure was inadequate to meet its *75 needs. Thus, the option agreement entered into between Daugette and the Church provided, inter alia, that $100,000 was to be paid to the latter by Daugette, or his nominee, before title to the 132 residential lots was to be transferred, assigned, and conveyed to Daugette or his nominee, and said sale and transfer was to be made within 30 days after the receipt by Daugette or his nominee of 132 FHA commitments. Petitioner and its stockholders found it necessary to rescind the agreement of September 10, 1954, providing for the purchase of said lots by petitioner for an overall cost of $3,500 cash per lot because petitioner did not have the necessary money. In addition, the bank refused to make a construction loan to Daro unless the stockholders loaned $100,000 to petitioner. At the inception of the corporation Daugette was obliged to use his personal funds to submit applications to the FHA for loan commitments because the petitioner was low on funds. In Aqualane Shores, Inc., 30 T.C. 519 (1958), affd. 269 F. 2d 116 (C.A. 5, 1959), three partners acquired a large tract of real estate (swampland) in 1949, for which they planned an extensive development, and *76 their adjusted cost basis was $69,000. In 1950, they organized the corporation, in which their proprietary interest was the same as in the partnership, and conveyed the swampland to it at a price of $250,000, subject to a prior mortgage of about $50,000. The partners received a purported down payment of $9,000 and the corporation agreed to pay the balance of $191,000 in five annual installments for which no security was given. The new corporation started in business with the land acquired and $600 in operating funds. The corporation immediately required considerable amounts of working capital and borrowed large sums secured by mortgages. Holding that the transaction in reality constituted an exchange of property for a proprietary equity in the corporation under section 112(b)(5) of the 1939 Code and the basis of the realty to the corporation was the same as that of the grantor-partners, we said (p. 528): there was * * * no true debtor-creditor relationship between petitioner and the parties, and that, to the contrary, there was in substance an exchange by the partners of property in return for a proprietary equity in the corporation equivalent for tax purposes (which are concerned *77 with economic realities) to a transaction covered by the provisions of section 112(b)(5). In affirming the Tax Court, the Court of Appeals said (p. 119): The payment of obligations of the corporation to its transferors, the stockholders of the corporation, was dependent upon and at the risk of the success of the venture. The obligations were a participation in the pot luck of the enterprise. * * * We are satisfied on the basis of the foregoing discussion that application of recognized criteria to the aggregate of the circumstances in the instant case leads to a necessary conclusion that the alleged sale was fictitious, and that no debtor-creditor relationship was established. Cf. Sun Properties, Inc. v. United States, 220 F. 2d 171 (C.A. 5, 1955); Rowan v. United States, 219 F. 2d 51 (C.A. 5, 1955), reversing (W.D. Texas 1954) F. Supp. . Issue II. Interest Deduction ($4,059.73) Petitioner concedes on brief that if we hold (as we have) that the alleged sale of the option to petitioner for $114,180 was not bona fide, we must also disallow the deduction of the alleged interest payment of $4,059.73 claimed by petitioner in its return for the taxable *78 year ended March 31, 1956. No further discussion of this issue, therefore, appears to be required. Issue III. Interest on alleged loan to petitioner ($6,664) In his statutory notice, respondent determined that the sum of $10,723.73 paid to stockholders of petitioner and claimed as interest expense on its return for 1956 (as part of an aggregate amount of $45,432.22) is not an allowable deduction under section 163, supra. Of said $10,723.73 the sum of $6,664 in question represents interest paid to the stockholders for the amount of $100,000 allegedly loaned to petitioner and evidenced by petitioner's promissory notes. Respondent urges on brief that by virtue of petitioner's undercapitalization, the $100,000 was in reality a contribution of capital at the risk of the new business and did not create a bona fide indebtedness. He argues that the notes were only evidence of the stockholders proprietary interest in petitioner, and that the interest payments constituted nondeductible distributions in the nature of dividends. We find it difficult to understand respondent's position in view of the stipulation of the parties, paragraph 9, which reads in part as follows: On October 13, 1954, the *79 following stockholders of petitioner loaned to the petitioner the amounts opposite their names on the date shown. On August 31, 1955, petitioner repaid said amounts to the lenders with interest on the date indicated. The loan was evidenced by promissory notes executed by petitioner and delivered to each lender. The names of the lenders, the amounts loaned by each and the interest paid are set forth in the same paragraph of the stipulation and are likewise set forth in our Findings. A copy of one of the promissory notes was attached to the stipulation and it was agreed that the remaining notes were identical except as to the name and amount as set forth in the stipulation, the total amount loaned was $100,000 and the total amount of interest paid was $6,664. Respondent, in paragraph 9 of his request for Findings of Fact, asks that we find precisely the same facts as set forth in paragraph 9 of the stipulation. No motion has been filed asking that either of said paragraphs be amended or stricken, and respondent merely ignores said paragraphs in his brief. We see no reason why the stipulation is not to be taken as binding on respondent, but to avoid any misunderstanding, we express *80 our own views on the merits. The evidence satisfies us that the alleged loan was in fact a loan, and that the interest paid thereon is a properly allowable deduction. The loan was made because the bank required it and refused to make the loan to petitioner of $1,350,000 unless the stockholders loaned petitioner the sum of $100,000. Unlike the transaction relating to the transfer of the Option Agreement to petitioner under circumstances demonstrating lack of bona fides, the evidence establishes that the loan of $100,000 was made in good faith. Here, also, there is no indication of tax avoidance motives, and there appears no basis for inferring any questionable objectives. Petitioner executed its promissory notes evidencing the loans, interest was charged, and the amount of the notes was paid to the lenders. The mere fact that the stockholders might have contributed the amount of $100,000 to capital does not mean that they did so, and our recognition of the thin capitalization of the corporation does not of itself require a contrary conclusion. After consideration of all of the relevant circumstances we hold for petitioner on this issue and allow the interest item of $6,664 *81 as a deduction. Issue IV. Reasonableness of Compensation Respondent disallowed one-half of the respective salaries of Caraway, Holmes, and Perrilliat. The respective amounts disallowed were $6,750, $5,400, and $3,600. The burden of proving reasonableness of compensation is upon petitioner. Botany Worsted Mills v. United States, 278 U.S. 282 (1929); Crescent Bed Co., Inc. v. Commissioner, 133 F. 2d 424 (C.A. 5, 1943), affirming a Memorandum Opinion of this Court. The question of what constitutes reasonable compensation within the meaning of section 162(a)(1), supra, is essentially a question of fact to be determined by the particular circumstances of each case. When, as here, the corporation has only a few stockholders and they are the officers who control the corporation and fix their own compensation, their action must be carefully scrutinized to prevent allowance of a deduction under the guise of compensation which is in fact a dividend distribution. Golden Construction Co., Inc. v. Commissioner, 228 F. 2d 637 (C.A. 10, 1955), affirming a Memorandum Opinion of this Court. At the same time, the exercise of business judgment of directors *82 in fixing salaries in the conduct of a business operation with which they are more familiar than the respondent is not to be lightly disregarded even in a closely held corporation, especially in the absence of any indications of bad faith, and where, as in the instant case, there is no family relationship. The details of the services rendered by the several officers are set forth in our findings and need not be restated. The active operations of petitioner were carried on largely by Daugette, Caraway, and Holmes. Respondent did not disallow any part of the $18,000 salary paid to Daugette. There is little difference in the nature and quality of the services performed by Daugette and Caraway, except for the fact, on the one hand, that Daugette was president and chief executive while Caraway was secretary-treasurer, and, on the other, that Caraway handled almost all of the advertising. Each spent approximately the same amount of time in performing his duties. The relative significance of their services is reflected in a salary to Caraway of $13,500, i.e., $4,500 less than the compensation paid to Daugette. We think the affirmative evidence establishes the fact that the compensation *83 to Caraway (now deceased) was no more than reasonable for the services performed by him, as well as consistent with the compensation to Daugette. We hold, therefore, that a salary deduction of $13,500 to Caraway is to be allowed. Holmes, while junior to Daugette and Caraway, was one of the vice presidents and performed services substantially similar to those of Daugette and Caraway except that he spent a little less time on the business of petitioner, and did not handle any of the advertising. The differences are again reflected in the salaries paid, Holmes receiving $10,800 ($2,700 less than Caraway). We hold that Holmes' salary was no more than reasonable and is to be allowed in full. With respect to Perrilliat's compensation, we take a different view. His participation in petitioner's affairs was limited to weekends and sometimes one day during the week. He testified that he had his "hands full with Perrilliat-Richey," the firm in which he was employed full time, and which was the general contractor for petitioner. His compensation was based on his customary charge to personal clients as an appraiser and consultant. While Perrilliat may have received $100 to $150 a day from *84 his own personal clients for appraisals and consultations, the record does not establish the extent to which he rendered similar services to petitioner. There is no doubt that he was consulted from time to time and that he did give advice which was followed. He did, however, particularly on Saturdays and Sundays, spend a good deal of time talking to prospective buyers and pointing out the good features of the houses. He also sold two of the houses himself. He does not claim to be an experienced real estate salesman, and if anything, appears to belittle his capacities in that field. What proportion of Perrilliat's time and efforts were devoted to contacts with prospects and what the value of those efforts may have been is not established by the record. The same may be said of his functions as consultant. Recognizing, as already indicated, the right of a corporation's directors to exercise some judgment in such matters, we must also recognize respondent's function and duty to confine salary deductions within the limits of reasonable compensation for services actually rendered. Moreover, the burden of proof rests with petitioner, and with respect to Perrilliat's salary we find no *85 support for the view that respondent erred in his determination. The Gem Jewelry Co., Inc. v. Commissioner, 165 F. 2d 991 (C.A. 5, 1948), affirming a Memorandum Opinion of this Court. Accordingly, we sustain respondent's disallowance of Perrilliat's salary in the amount of $3,600. Decision will be entered under Rule 50. Footnotes
1. For an extensive discussion of the several criteria to be considered in determining whether a particular transaction created a debtor-creditor or a stockholder relationship, see note on "Thin Capitalization and Tax Avoidance," 55 Columbia Law Review 1054 (1955)↩, and the numerous authorities referred to therein. Also, Myron Semmel, "Tax Consequences of Inadequate Capitalization," 48 Columbia Law Review, 202 (1948).